ACCINANTO, Limited et al. v. COSMOPOLI-TAN SHIPPING CO., Inc., and five other cases.

Nos. 3028, 3035, 3037, 3053, 3058, 3060.
United States District Court
D. Maryland, Admiralty Division.
Aug. 7, 1951.

Lord, Whip & Coughlan, and George W. P. Whip, all of Baltimore, Md., Bigham, Englar, Jones & Houston, Henry N. Longley, and James H. Simonson, all of New York City, for libellants.

Ober, Grimes & Stinson, and William A. Grimes, all of Baltimore, Md., Haight, Deming, Gardner, Poor & Havens, Wharton Poor, and Tallman Bissell, all of New York City, for respondents.

CHESNUT, District Judge.

These consolidated admiralty cases require consideration of sections 1303 and 1304 of the Carriage of Goods by Sea Act, (hereinafter sometimes referred to as C.G. S.A.) 46 U.S.C.A. §§ 1300–1315, and their proper application to the facts of the cases. I have separately made findings of fact including the more important evidentiary facts; but for the purposes of this opinion, in stating my conclusions of law, it will be sufficient to state only undisputed facts and the ultimate facts as found without evidentiary detail.

The libellants in the six cases were the shippers, consignees or owners of general merchandise cargo shipped from New York and to be discharged at Antwerp, Belgium, and LeHavre, France, on the Ocean Liberty, an American built Liberty ship of that usual type. The respondent A/S J. Ludwig Mowinckels (hereinafter called Mowinckels) is a Norwegian corporate ship owner which was the sub-charterer of the Ocean Liberty, owned by a Norwegian corporation and by it chartered to Saguenay Terminals, Ltd., which in turn sub-time chartered it to Mowinckels for the particular voyage. The ship was manned and victualed by its Norwegian owner. The other respondent, Cosmopolitan Shipping Company, Inc., is a Delaware corporation with principal office in New York City, acting as general agents in the United States for Mowinckels. Mowinckels operated other ships between United States North Atlantic ports and Antwerp and certain French ports under the trade name of "Cosmopolitan Line".

The Ocean Liberty was delivered to Mowinckels at Baltimore on June 28, 1947. Between that date and July 5, 1947 she was there loaded with 739 tons of ammonium nitrate fertilizer (hereinafter called Fgan) in lower hold No. 1; 1381 tons in lower hold No. 3 and 1189 tons in lower hold No. 5. No other cargo was stowed in these lower holds, but the ship also took on 1927 tons of general cargo at Baltimore. She then sailed to New York where 2551 additional tons of cargo were stowed on or under deck but none in the holds where the Fgan was stowed. She there cleared for the ports of Antwerp, Cherbourg, LeHavre and Boulogne to be visited in that order. On July 22, 1947 when about to enter the English Channel off Bishop's Rock, she was diverted by a radio message authorized by Mowinckels to go directly to Brest, France, a port to the west of Cherbourg. She arrived at Brest on July 23 and lay there at the dock until July 28th when a fire was discovered about 12/30 P.M. in lower hold No. 3 which contained ammonium nitrate fertilizer. The fire progressed rapidly, could not be extinguished by the local fire department, and while she was being towed out of the harbor, she stranded on a sand bar and about 5:30 P.M. exploded completely destroying the ship and all the cargo then on board, a considerable part of the general merchandise cargo consigned to Antwerp and LeHavre having been landed on the dock at Brest, in order to permit the unloading of certain gondolas (knocked down railroad cars) consigned to the French Government. The goods which had been unloaded on the dock were either destroyed or greatly damaged by the fire originating on the ship.

The libels in these cases were filed on behalf of shippers or owners of cargo wholly consigned to Antwerp or LeHavre. The suits are libels in personam with foreign attachment of a Mowinckels ship which was released upon filing of a stipulation for $400,000 only, the libellants in these cases claiming an aggregate amount of damages much in excess of that amount. The libels

are in two counts of which the first, in contract only, alleged in substance the delivery of the cargo in good condition to the carrier and its failure to deliver to the shipper or other consignee. There is no charge of negligence against the carrier or its agents in that count. The second count in each case asserts that by virtue of the deviation from the destined course of the voyage to Antwerp, the carrier became an insurer of the cargo and is therefore liable for its full value.

■ The first defense asserted by Mowinckels, the carrier, is based on the well known American fire statute, 46 U.S.C.A. § 182, which in substance exempts the *owner* of a vessel from liability for damage to cargo by fire "unless such fire is caused by the design or neglect of such owner". As Mowinckels was not the owner of the Ocean Liberty it is not protected by this section 182 but its counsel calls attention to section 186 of title 46, which provides that "The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel. * * *" It is suggested that there is no valid reason why a charterer of a ship should not be regarded as the owner and also that a subcharterer should be regarded as having procured the manning, victualing and navigation of the ship through its contractual obligation, but no authority is cited in support of this contention and I am unable to accept it. However its inapplicability to Mowinckels is perhaps not very important in view of the relevant provision in section 1304(2)(b) of C.G.S.A. which reads:

"Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from * * * (b) Fire, unless caused by the actual fault or privity of the carrier;".

In my view the phrase "actual fault or privity" contained in C.G.S.A. is to be construed as substantially equivalent to "design or neglect" in the fire statute.

The first important question of fact is to determine, in the language of the Act, whether the fire in this case was caused by the "actual fault or privity" of the carrier. I have found, as stated in the findings of fact at some length, that the fire in this case originated in lower hold No. 3 from spontaneous combustion of the Fgan. The first evidence of the fire was the yellow smoke pouring from the deck ventilators of No. 3 hold. Counsel for Mowinckels argues that it might have originated in the tween decks of No. 3 hold. But it appears that only general cargo, not subject to spontaneous combustion, was there stowed. The tween decks hatch to the lower hold and the deck hatch to the No. 3 tween decks were tightly fastened down at the time the fire was discovered. As I have said in the findings of fact it probably could not be said to have been proven beyond a reasonable doubt that the fire originated in the ammonium nitrate but my ultimate conclusion of fact is that a preponderance of the evidence sufficiently establishes that it did. This conclusion is based on all the evidence in the case, including the scientific evidence (not really controverted by the respondent), the color of the smoke, the obnoxious fumes emanating from the hold when a few hatch boards were removed, by the evidence of eye witnesses as to the rapid progress of the fire, by a minor explosion which very soon occurred, and by the utterly destructive explosion which occurred a few hours later when the ship had been towed some distance away from the dock. The latter explosion not only destroyed the ship and its remaining cargo but unfortunately killed several persons on shore or nearby, including the master of the ship.

■ The important question in the case is whether the fire was due to the actual fault or privity of the carrier. On the evidentiary facts separately stated I have concluded that it was. The actual fault of the carrier in this case was in authorizing the carriage of the ammonium nitrate fertilizer in large quantities in the lower holds of the ship without adequate provision for ventilation, the necessity for which could and should have been learned by the carrier if proper inquiry had been made before accepting the Fgan for carriage. The great importance of such inquiry should have

been apparent to the carrier in view of the terrible disaster which had occurred about two months earlier at Texas City, Texas, where a ship then being loaded with Fgan caught fire and exploded with great loss of life and damage to property. This event was a great disaster of nearly world wide importance and especially noteworthy to the shipping industry. While the susceptibility of ammonium nitrate fertilizer to spontaneous combustion was I think not definitely or precisely known generally when the Fgan was loaded on the Ocean Liberty, nevertheless the lesson plainly taught by the Texas City disaster was that the carriage of ammonium nitrate fertilizer was fraught with hazard by virtue of its dangerous character.

■ While common carriers by water are no longer legally liable as insurers of the cargo by reason of applicable amending statutes, it is still the law in this Circuit, as illustrated by numerous cases, that a carrier is charged with the responsibility of making proper inquiry as to the characteristics of the cargo that it accepts. If proper inquiry had been made by the carrier it should have been learned by it not only that very great care and caution should be taken in transporting Fgan, but also that it was under certain conditions susceptible to spontaneous combustion especially if stowed in large masses for a considerable period of time in the hold of a ship without unusually good ventilation. As stated in some detail in the findings of fact the extra care and precaution which was taken in stowing the ammonium nitrate on the Ocean Liberty was apparently for the protection of the Fgan from fire from outside sources, or contact with foreign substances, but without giving proper attention to the necessity for unusually good ventilation. It was the affirmative duty of the carrier to consider the safety not only of the ship but also of its cargo, and the acceptance of the large quantity of ammonium nitrate with knowledge of its very dangerous character in transportation without the proper inquiry as to the possibility of spontaneous combustion, constituted in my opinion an actual fault of the carrier.

■ Due diligence is not an absolute but a relative term to be determined under all the facts and circumstances of the particular case. One very important circumstance is the knowledge of the very dangerous character of ammonium nitrate in transportation brought so vividly home to the shipping industry by the Texas City disaster. In passing it may be noted that in suits against the United States under the Federal Torts Act in Texas, District Judge Kennerly recently found as a fact that the fire in the Fgan there was due to spontaneous combustion. This finding made in 1950 would, of course, not be relevant to the general knowledge on the subject existing in 1947 and that finding (now on appeal I understand) has not been considered by me as relevant to what could and should have been learned by the carrier in this case in 1947.

■ I have also concluded that the Ocean Liberty was unseaworthy when she sailed from New York by reason of the inclusion in the ship of this dangerous commodity. The applicable section of C.G.S.A. is 1304(1) which provides in part: "Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy * *. * in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section." For much the same reasons as heretofore stated, it is my view that under the facts of this case the carrier, on whom the burden of proof is imposed in this respect, has not met the burden by showing the exercise of due diligence to learn the nature and characteristics of Fgan. As the carrier must have known that it was an extremely dangerous commodity to transport, due diligence under the circumstances imposed the duty of making more than ordinary routine or customary general inquiries which might be reasonably sufficient to show due dili-

gence with respect to commodities generally. In view of the very hazardous nature of the Fgan something more was required of the carrier in this case than to rely upon merely general knowledge. It was not due diligence with respect to the safety of the general cargo for the carrier to accept this dangerous commodity without much more particular inquiry than it made in this case. Apparently too great reliance was placed upon the only general supervision of the loading by the local Fire Department, the Coast Guard and the representatives of the New York Board of Underwriters. These representatives were apparently not themselves aware of the danger of spontaneous combustion in the masses of Fgan stored in the lower holds, but the carrier cannot shift its responsibility by reliance upon the ignorance of others not charged with a particular duty. In their only very general supervision of the loading they were doubtless conforming to the general practice and acting, at least as to the Fire Department and Coast Guard, with concern for local safety. While they were probably personally ignorant of the danger of spontaneous combustion of the Fgan that characteristic was not unknown as appears from official governmental publications referred to in the findings of fact, although the exact conditions under which spontaneous combustion would occur in ammonium nitrate fertilizer were not precisely known.

The Court of Appeals for this Fourth Circuit has in recent years considered and upheld the liability of carriers for damage to cargo by reason of failure to take adequate precautions with respect to acceptance and handling of some cargo susceptible to spontaneous combustion. In Bank Line v. Porter, 4 Cir., 25 F.2d 843, 845 (damage by spontaneous combustion in jute) the law was summarized by Judge Northcott as follows: " 'The law imposes upon owners of ships the duty of using due care to ascertain and consider the nature and characteristics of goods offered for shipment, and to exercise due care in their handling, including * * * such methods as their nature require.' Southern Pac. Co. v. Walker-Smith, etc. (Tex.Civ.App.) 257 S.W. 347; [The] Willfaro [The] Will-

solo, (D.C.), 9 F.2d 940, affirmed [Williams S. S. Co., Inc. v. Wilbur] 9 Cir., 9 F.2d 622; Arkell & Douglas v. U. S., 2 Cir., 13 F.2d 555; Herman et al. v. Compagnie G. T., 2 Cir., 242 F. 859."

To the same effect see also The Nichiyo Maru, D.C.Md., 14 F.Supp. 727, affirmed 4 Cir., 89 F.2d 539, fish meal; The Ferncliff, D.C.Md., 22 F.Supp. 728; affirmed Smith v. The Ferncliff, 4 Cir., 105 F.2d 1021, Id., 306 U.S. 444, 59 S.Ct. 615, 83 L.Ed. 862, answering certified questions (also fish meal); Cornec v. Baltimore & O. R. Co., 4 Cir., 48 F.2d 497 (fire and explosion of pitch dust). While the facts of these cases are quite different, the principles applied therein support the conclusion in this case on the point just above discussed as to the liability of Mowinckels, the carrier.

Counsel for the libellants contend that Cosmopolitan Shipping Company, the agent here for Mowinckels, is jointly liable with the latter as a carrier, and that the agent is also independently liable as a tort feasor by reason of alleged negligence in stowage of the Fgan. The alleged liability as carrier is apparently based on the form of execution of the bills of lading. It is suggested that as Mowinckels is not personally named the agent becomes liable as carrier under the legal doctrine of an undisclosed principal. But in my opinion this contention is untenable. At the very top of the bill of lading there appears in prominent type that the bill of lading is issued by the Cosmopolitan Line which was at the time a trade name for the Mowinckels ships in service between North Atlantic ports and Antwerp and French ports. Mowinckels was a member of the North Atlantic Freight Conference and this trade name for it was duly registered with the United States Maritime Commission in Washington. It is also to be noted that the Cosmopolitan Shipping Company signed the bills of lading specifically as agent for the master of the ship (the Ocean Liberty), and the master was himself named in some but not all of the bills of lading. It is also important to note that the bills of lading contain an express notice to the effect that the Cosmopolitan Shipping Company was

acting only as agent and under no liability as carrier or bailee of the goods.[1]

▪ In these circumstances I think it clear enough that Mowinckels was sufficiently identified. A. L. I. Restatement of Agency, ss. 4(1), 320, 321; Hudson Trading Co. v. Hasler & Co., Inc., D.C.S.D.N.Y. 11 F.2d 666; Lutz v. VanHeynigen Brokerage Co., 199 Ala. 620, 75 So. 284; Waddell v. Mordecai, 3 Hill, Law, S.C., 22; Williston on Contracts (Rev.Ed.) s. 285. From the very nature of the case there could have been no obscurity or uncertainty to any of the libellants as to who was the carrier in this case. A large shipping company could not well conceal its identity as carrier for a particular ship such as the Ocean Liberty. Nor was there any apparent difficulty on the part of counsel for the libellants in promptly ascertaining that Mowinckels was the carrier. And when so sued by a libel in personam with foreign attachment, Mowinckels promptly answered and in no way disputed the fact of its liability, if any, as carrier.

▪ Furthermore, as a matter of procedure the libellants are not entitled to hold both principal and agent jointly liable in a suit for breach of contract as is the case here. The Jungshoved, 290 F. 733, 2d Cir., certiorari denied Dampskibs Selsk Dannebrog v. J. Aron & Co., Inc., 263 U.S. 707, 44 S.Ct. 35, 68 L.Ed. 517; Johnson & Higgins v. Charles F. Garrigues Co., 2d Cir., 30 F.2d 251; (Cf. Ore S. S. Corp. v. D/S/A/S Hassel, 2 Cir., 137 F.2d 326, 330, apparent dicta by same court in a later case); Hospelhorn v. Poe, 174 Md. 242, 259, 198 A. 582, 118 A.L.R. 682.

▪ Nor is the Cosmopolitan Company independently liable in tort for negligent stowage. The libels do not allege negligence but only breach of contract. It was said at the trial by counsel for the libellants that this is immaterial in admiralty, but, while the technical doctrine of variance between pleading and proof does not prevail in admiralty, no satisfactory authority has been brought to my attention to establish the proposition that admiralty pleadings are to be so largely disregarded that a clearly stated claim for joint liability as principals in a contract for carriage can properly be treated as fair notice to one of the respondents, as an agent, of an independent claim against it for negligence. But however that may be, I do not find there was any affirmative negligence on the part of Cosmopolitan Company in the stowage. The Fgan was entirely loaded on the Ocean Liberty in Baltimore by stevedores acting for the Terminal Shipping Company, a subagent engaged for that purpose by the Cosmopolitan Company. In legal theory the stowage of cargo on the ship was under the control of the master of the ship. As pointed out in the separately stated facts, the deficiency in the stowage here was in not providing for an extraordinary amount of ventilation. The necessity for such ventilation was not generally known at the time because it was not generally known that Fgan when stowed solidly like other bagged cargo and without extraordinary ventilation was susceptible to spontaneous combustion. What was known and carefully guarded against in the actual stowage in this case was prevention of fire in the Fgan originating from outside sources or contact

1. Some of the bills of lading were so-called short form and others were in long form. The short bills of lading also made reference to the long form which was on file with the Maritime Commission. In the long form the provision that the agent should not be held liable as carrier read as follows: "It is further understood and agreed that as the Line, company or agency which has executed this Bill of Lading as agent for the Master, or Captain, is not a principal in the transaction, but merely an agent, said Line, Company, or agency shall be under no lia-bility arising out of, or by virtue of, the contract of carriage, nor as carrier or bailee of the goods."

And in the short form the provision read: "This Bill of Lading shall take effect only as a contract with the named carrier or owner or demise charterer or requisition owner, as the case may be, as principal, made through the agency of the Cosmopolitan Shipping Company, Inc., which acts as agent only and shall be under no personal liability whatsoever in respect thereof."

with certain foreign substances. Unusual care was taken in the actual stowage for such protection. The actual stowage was from time to time inspected and approved by representatives of the Coast Guard, the Baltimore Fire Department and the New York Board of Underwriters, and met with their approval. I have found that it was the duty of the carrier in this case to have made more particular and diligent inquiry than it did with respect to the nature and characteristics of Fgan. While this was a duty owing from the carrier as such to the owners of the cargo, it was not a duty owing to them by the agent, even if it should be assumed that the agent owed such a duty of particular inquiry to its principal. If, therefore, there is any basis for the charge of negligence against the agent it lies only in its failure to have made the particular inquiry. It was not guilty of any affirmative act of negligence in the stowage. Not only was the stowage approved by the representatives mentioned, but it was also substantially the same as that which had been practiced in the loading of about a dozen other ships with Fgan in the Baltimore Harbor about the same time. At most the neglect, if any, of the agent was a mere non-feasance and not a mis-feasance or mal-feasance in the performance of its duty. It is sometimes difficult to accurately and precisely draw a dividing line between non-feasance and mis-feasance with respect to the duties of an agent to third persons but the facts of this case I think clearly indicate if anything non-feasance. See Knight v. Atlantic Coast Line R. Co., 5 Cir., 73 F.2d 76, 99 A.L.R. 405; Kelly v. Robinson, D.C., 262 F. 695; A. L. I. Restatement Agency, s. 352; Mechem on Agency, Vol. I, 2d. Ed. ss. 1464, et seq.; 2 C.J.Agency, p. 824; 3 C.J.S., Agency, §§ 221, 222–223, pp. 130, 133–134.

In the second count of the libels it is alleged that both respondents became liable as insurers of the cargo by reason of a deviation from the customary course of the voyage to Antwerp, by going first to Brest where the fire occurred. So far as Cosmopolitan Company is concerned, the evidence wholly fails to support this charge

because deviation to Brest was directly authorized by Mowinckels without any participation therein by Cosmopolitan, and apparently without even its knowledge. But at least as to Mowinckels the claim is pressed with great vigor. In view of the conclusion reached as to the liability of Mowinckels as carrier in this case, it is not necessary, for the decision here, to also decide the point as to deviation; but, as the question has been extensively argued by counsel for both sides, and as the case may be appealed, it may be useful to comparatively briefly express my opinion on this latter point.

The voyage was well advertised by Cosmopolitan as a fast freight service to Antwerp and French ports. The Ocean Liberty "cleared" from New York on July 11, 1947 for Antwerp, Cherbourg, LeHavre and Boulogne, in that order. On July 18th a "wild-cat" strike of stevedores began at Antwerp and increased in intensity until it finally terminated on July 31st. On or about July 22nd when other ships at Antwerp could not be unloaded the Antwerp agent of Mowinckels communicated with the French agents who in turn authorized or directed the master of the ship by radio to call first at Brest. The reason for this deviation was on account of the strike at Antwerp which reasonably seemed to mean a tie-up of the ship at Antwerp for an indefinite time in the future. On July 22nd the master of the ship received the radio message to go to Brest, when the ship was near Bishop's Rock at the entrance to the English Channel. The customary course to Antwerp from Bishop's Rock was in a northeasterly direction. The course to Brest was in a southeasterly direction. Brest was about 134 miles from Bishop's Rock. It was also about 200 miles west of Cherbourg which in turn is west of LeHavre and the latter is west of Boulogne. The reason for directing the master of the ship to go to Brest first was due to an order from the French Government authority for brevity called "Impex". When the French agents for Mowinckels conferred with Impex as to French ports of call, Impex required that certain gondolas (knocked down railroad cars) for French govern-

ment railroads should be unloaded at Brest instead of Cherbourg as consigned in the bills of lading. The reason for requiring unloading at Brest was stated to be for greater convenience of the French Government and the better docking facilities there. As none of the cargo was consigned to Brest apparently the French agents explained that the call at Brest in addition to Cherbourg, LeHavre and Boulogne would entail greater burden on the ship and as a result of a conference or discussion Impex finally decided to order all French cargo to be unloaded at Brest and Cherbourg. Brest was about 485 miles from Antwerp. Brest was not a customary port of call for the Cosmopolitan Line and it is said that no ship of that Line had previously called at Brest. The Fgan was all consigned for discharge at Boulogne but as a result of the order by Impex would, had not the fire occurred, probably have been unloaded at Cherbourg. In passing it may be noted that separate libels by the owners of the Fgan, instituted by counsel for the libellants, were voluntarily dismissed by them on the stated ground that the owners preferred to seek other remedies.

The question in the case on the point of deviation is whether departure from the customary course of the voyage to Antwerp constituted an unreasonable deviation which resulted in making the carrier liable as an insurer. The law and evidence has been elaborately argued by counsel on both sides. Almost every conceivable persuasive argument either pro or con has been advanced in the case. I have endeavored to carefully consider and weigh all of them and while the question is, I think, a debatable one, my conclusion is that under the evidence the deviation was reasonable.

Counsel for the libellants submits an interesting legal argument (with which I very largely agree) with respect to the origin and development of the maritime law of deviation. It is pointed out that under the present law the carrier's duty and liability for breach of it, is derived from the law of marine insurance under which the policy described the risk assumed by the insurer as on a named ship from a named port to a named port. If the ship, without reason or necessity, deviated from the customary voyage from one port to another, the policy was avoided. The logical consequence of this insurance law was that the ship which made the deviation became itself the insurer of the cargo. When the latter law became established carriers sought to avoid the effect by a so-called "liberty clause" in the bill of lading. In the instant case Mowinckels relied strongly on such a clause in its bills of lading which provided that the goods were to be transported "with liberty to proceed via any port or ports within the scope of the voyage described herein, to the port of discharge * * *". The "scope of the voyage" was thus defined: "The carrier's general trade is between ports on or adjacent to the East coast of North America in any order and French Atlantic, and French, Belgian and Netherlands Channel ports in any order."

The bills of lading also contained (paragraphs 3, 4 and 5) even broader and more specific language which at least if literally applied would have justified the call at Brest.[2] But counsel for the libellants con-

2. Paragraphs 3, 4 and 5 of the bills of lading read:

"3. The scope of voyage herein contracted for shall include usual or customary or advertised ports of call whether named in this contract or not, also ports in or out of the advertised, geographical, usual or ordinary route or order, even though in proceeding thereto the ship may sail beyond the port of discharge or in a direction contrary thereto, or depart from the direct or customary route. * * * The ship may omit calling at any port or ports whether scheduled or not, * * *.

"4. In any situation whatsoever or wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Carrier or master is likely to give rise to * * * detention, damage, delay or disadvantage to * * * the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to proceed on or continue the voyage or to enter * * * the port

tends that by judicial authority, before the passage of the Carriage of Goods by Sea Act, such liberty clauses were so restricted by interpretation of the contract of carriage as a whole that in effect they could not be relied upon by the carrier to justify a deviation which was inconsistent with the general and dominant purpose of the voyage, to which they must be considered as subordinate in effect.

However that may be, the governing law as to the effect of deviation is now to be found in C.G.S.A. § 4(4), 46 U.S.C.A. § 1304(4), which reads: "Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable."

There is not much help to be found in the admiralty cases decided since 1936 (when the United States Carriage of Goods by Sea Act became effective) by a factual analogy on the question here presented as to whether the deviation was "reasonable". But in this Circuit the applicable principles are clearly and fully stated by Judge Parker in The San Giuseppe, 4 Cir., 122 F.2d 579. Under the facts of that case the deviation was held reasonable. In the case of Stag Line Ltd., and Foscolo, Mango and Co. Ltd. (the Ixia), L.R. (1931) 2 K. B. 48; 1932 App.Cas. 328, in applying the

English C.G.S.A., under quite different facts, the deviation was held unreasonable and the carrier liable. The English Act is similar to the United States Act except that it omits the proviso above quoted in the United States Act. In general the principles applied in the Ixia are not different from those in this Circuit. In The San Giuseppe it was held that the word "reasonable" contained in the C.G.S.A. was to be given the same meaning that it had always had with respect to the law of deviation. It was said: "Prior to the passage of the act, a deviation was defined as a 'voluntary departure without necessity or reasonable cause from the regular and usual course of the voyage'. * * * A departure from the regular course of the voyage through necessity or for reasonable cause was not, under the prior maritime law, a deviation forfeiting insurance or rendering the vessel an insurer; and, for the purposes of this case, we may assume that the words 'reasonable deviation' as contained in the statute confer no greater liberty upon the vessel than she had under the rule of the maritime law prior to its enactment. When the liberty to call clause is taken into consideration, we think that the call at Norfolk cannot be considered either unreasonable or without necessity within the meaning of that rule." 122 F.2d at page 582.

The conclusion was reached by the court despite the fact that the evidence did not technically establish the custom for the call at Norfolk. It is also apparent from the opinion 122 F.2d at page 584, that the liberty clauses are not to be entirely disre-

of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge * * * the Master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein, or attempting to discharge the goods there, may * * * proceed or return, directly or indirectly, to or stop at such other port or place whatsoever as he or the Carrier may consider safe or advisable under the circumstances, and there discharge the goods or any part thereof without giving any prior notice * * *.

"5. The Carrier, master and ship shall have liberty to comply with any orders or directions as to loading, departure, arrival, routes, ports of call, stoppages, discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having, under the terms of the war risk insurance on the ship, the right to give such orders or directions. Delivery or other disposition of the goods in accordance with such orders or directions shall be a fulfillment of the contract voyage. * * *"

garded by reason of the provisions of section 1303(8) of the C.G.S.A. which provides that any provision in the contract of carriage which seeks to lessen the carrier's obligations or liabilities as provided by the Act shall be null and void and of no effect.

It would unduly extend this opinion to attempt discussion of the many well argued points pro and con on this ultimate question as to whether the deviation in this case was reasonable. It is suggested by counsel for the libellants that the call at Brest was for the purpose of loading or unloading cargo which, by the proviso of United States C.G.S.A. was prima facie unreasonable. In a sense it is true that the Ocean Liberty did go to Brest to unload goods but it is also clear that the proximate cause of the deviation to Brest was the strike at Antwerp. And, while Impex had the authority to determine the French ports of call, its authority obviously did not extend to altering the course of the ship upon the high seas. It is also argued by counsel for the libellants that the order finally made by Impex requiring the call at Brest was not really in invitum as to Mowinckels because it was really to their advantage in limiting the French ports of call to two instead of three. But I do not accept this view. No doubt the order may have been affected by considerations urged by the French agents for the carrier but I think it was in actual legal effect an order which had to be observed by the ship as to French ports of call.

I assume that to justify the deviation the burden of persuasion is on the carrier. The most plausible argument advanced by the libellants that this burden has not been met, emphasizes the newspaper advertisements with respect to the service as a fast freight line directly to Antwerp, and argues that despite the strike this should have been observed for the benefit of the Antwerp cargo. The deviation to Brest is said to have been unreasonable at least as to the Antwerp cargo, because there was no obstacle to the ship proceeding to Antwerp and if the strike was then still in progress the ship could have gone on to any one of several near by ports, in Belgium or the Netherlands and could have unloaded the cargo there as those ports were not affected by the strike. I have given careful consideration to this argument but have concluded that it is not really persuasive when it is apparent that even if the goods had been discharged at some other port than Antwerp and then transported by barge to Antwerp the continuation of the strike would still have prevented the carrier from performing its duty to discharge at Antwerp, and as pointed out in the findings of fact, it was very doubtful that other ports than Rotterdam, a hundred miles away in another country, would have been available for the Ocean Liberty by reason of its draft. Also when the strike situation became critical in the reasonable judgment of the Antwerp agent for Mowinckels it was impracticable to quickly ascertain whether discharge of the Antwerp cargo at Rotterdam or some other port would be acceptable to the Antwerp consignees. While under some of the clauses of the bill of lading it might have been justifiable for the carrier to have discharged at some port other than Antwerp, I do not think that course of action was reasonably required. The customary course of the voyage would have been to Antwerp, then returning to Cherbourg, and from there going again easterly to LeHavre and Boulogne. With the apparent impossibility of discharging cargo at Antwerp until after uncertain and indefinite delay, it was, I think, entirely reasonable for the carrier to call first at Brest, a French port which was measurably on the way to Antwerp, and thereafter proceed to Antwerp when the strike ended. It was reasonably apparent that course was in the interest of all parties including the numerous consignees of cargo as well as the ship.

■ The ultimate question is one of mixed law and fact. The law, I think, is clearly stated for this Circuit in the case of The San Giuseppe, supra. The final question is whether on the facts deviation to Brest was reasonable. My conclusion is that it was.

Counsel may present the appropriate orders in the cases in due course.

From the evidence in the above consolidated cases the court makes the following findings of fact:

1. A/S J. Ludwig Mowinckels Rederi, hereinafter called "Mowinckels", is a Norwegian corporate shipowner, which owned, chartered and operated vessels in a service between United States North Atlantic ports and Antwerp and Northern French ports, known by the name of Cosmopolitan Line. Cosmopolitan Shipping Company, Inc., is a general agent of Mowinckels in the United States. The SS Ocean Liberty had been time-chartered by Mowinckels for one voyage, as an additional steamer in the Cosmopolitan Line, from Saguenay Terminals, Limited, which had the steamer on time-charter from her Norwegian owners, Messrs. Bendixen.

2. The Ocean Liberty was a Liberty ship built in Portland, Maine, in 1943, and had generally dimensions, characteristics and capacities of that type of American built ship. She was 422.8 feet in length, 57 feet in breadth and 34.8 feet in depth. Her gross tonnage was 7176 and her net tonnage 4380. She was an oil burner and equipped with radio apparatus. She had 5 hatches and 5 holds.

3. The Ocean Liberty arrived at Baltimore on Saturday June 28, 1947. She then had no cargo on board and her holds were inspected by representatives of the United States Coast Guard, the Baltimore Fire Department and the Board of Underwriters of New York. They required that before the loading should commence the Ocean Liberty's holds should be thoroughly washed down because of the presence of some remnants of her previous cargo of bauxite ore. This was done and on Monday June 30th, the holds were again examined and approved by the representatives of the Coast Guard, Fire Department and Board of Underwriters. These unusual precautions were taken because the Ocean Liberty was to load a part cargo of ammonium nitrate, fertilizer grade, hereinafter called "Fgan". On April 16, 1947 at Texas City, Texas, there had been a fire followed by a disastrous explosion on the SS Grandcamp while loading such a commodity. However, large quantities of Fgan had been safely loaded at Baltimore and other United States ports and safely carried to destination in Europe and the Far East, both before and after the loading of the Ocean Liberty. The shipper of the Fgan was an agency of the French Government and the nitrate was required to meet the needs of French agriculture. The Fgan was packed in multi-wall paper bags, weighing about 100 lbs. net and 101.5 gross, and having a cubic footage of 1.6 cubic feet per bag.

4. Loading at Baltimore commenced on Monday, June 30, and was completed on July 5th, no work being done on the 4th.

5. The actual loading was done by Terminal Shipping Company, which was experienced in the loading of bagged and other cargo. The loading of the Fgan was also under the supervision of representatives of the U. S. Coast Guard, the Baltimore Fire Department and the Board of Underwriters, and met with all their requirements. Those organizations similarly supervised the loading of Fgan on other vessels. There is evidence that some bags of fertilizer were hot or warm when the railroad cars on the pier were first opened, but that they were allowed to cool and that the bags when stowed in the hold were not over about 100 degrees F. There was no satisfactory evidence to the contrary. The loading and stowage of the Fgan on the Ocean Liberty did not materially differ from the loading and stowage of the same commodity on other vessels loaded just before and after that time.

6. When the Ocean Liberty sailed from Baltimore on July 5th she had on board 739 tons of Fgan in lower hold No. 1, 1381 tons in lower hold No. 3, and 1189 tons in lower hold No. 5. After the loading of the Fgan was completed, the lower holds in which it was stowed were closed. No cargo except the nitrate was in these holds. None of the 'tween deck hatches were thereafter opened. Only Fgan was loaded in the lower holds in Baltimore.

7. The Ocean Liberty arrived at New York on July 7th and remained there load-

ing additional cargo until July 11th. The loading there was under the supervision of a representative of the Board of Underwriters who found it in order.

8. When the Ocean Liberty sailed from New York on July 11th she had on board 7787 tons of cargo on and under deck, 850 tons of which was to be discharged at Antwerp and the balance at French ports. It was expected, when the ship sailed, that her first port of call would be Antwerp and that she would then retrace her steps to Cherbourg and thereafter call at LeHavre and Boulogne. However, the bill of lading provided that the ship had liberty to proceed via any ports within the scope of the voyage in any order and did not require that the Ocean Liberty proceed first to Antwerp, or in any way state the order of the ports of call. The scope of the voyage was stated to be "between ports on or adjacent to the East Coast of North America in any order and French Atlantic and French, Belgian and Netherlands Channel ports in any order."

9. In July 1947 imports into France were subject to the control of a French Government body, the official title of which was Le Gouvernement de la Republique Francaise, Service des Importations et Exportations; usually called "Impex."

10. When vessels carrying general cargo (like the Ocean Liberty) were to discharge at French ports, the ship's Paris agent was obliged to notify Impex of the tonnage on board and the port or ports for which this cargo was destined. After an extended examination of the manifest, Impex then decided as to the ports of call. The decision of Impex was formally stated in writing at the daily meetings at the Secretariat Marine Marchande.

11. The Ocean Liberty had on board 979 tons of so-called gondolas (knocked-down railroad cars) which belonged to the Government-owned French State Railways. These gondolas were consigned to Cherbourg, but the French State Railways wished and Impex required that the gondolas should be discharged at Brest where there were better repair shops and facilities for putting the gondolas in service. Accordingly, at the meeting of the Sec-

retariat Marine Marchande of July 22, 1947, an order was entered relating to some 12 vessels, which, as regards the Ocean Liberty, provided that the destination had been fixed for "Brest, then Cherbourg".

12. A wildcat strike of longshoremen broke out at Antwerp on July 18, 1947. It was over on July 31st. If the Ocean Liberty had sailed there directly, she would have arrived at Antwerp on July 24th. The discharge of vessels or barges at Antwerp during the period of the strike between July 24 and July 31, would have been practically impossible. The libellants contend that the Ocean Liberty could have been discharged at Flushing, Middlegat, Zubregge, Bruges, Ghent or Rotterdam and the cargo carried by barges to Antwerp. I find that this course was not reasonably practicable. It is at best very doubtful whether any of these ports except Rotterdam would have been available to a vessel having the draft of the Ocean Liberty. Rotterdam was about 100 miles distant in another country, The Netherlands. Even if the Antwerp cargo had been transferred to barges at Rotterdam and carried to Antwerp, the barges could not have been unloaded there during the strike.

13. The Antwerp agents notified Mowinckels of the Antwerp strike and also communicated with the French agents, by whom they were notified of the order of the Secretariat Marine Marchande that the Ocean Liberty's first French port of call should be Brest. It was decided that the Ocean Liberty should not proceed to Antwerp but should go first to Brest. The agents, with the approval of Mowinckels, radioed the master of the Ocean Liberty on July 22nd to proceed to Brest. The Ocean Liberty was at that time eleven days out of New York. She arrived at Brest on July 23rd.

14. Discharge of the Ocean Liberty at Brest commenced on July 24th. The requirement of the French Government that the gondolas be discharged at Brest necessitated the discharge of a considerable part of the Antwerp cargo, and some of the cargo destined for LeHavre. The holds in

which Fgan was stowed were not opened except that some automobiles were removed from the No. 5 'tween deck, and thereafter the No. 5 weather deck hatch covers were replaced. Other cargo was unloaded from the cargo stowed on deck and also some cargo from Nos. 2 and 4 holds.

15. The discharge proceeded until Monday, July 28, 1947, when, at about 12:30 P.M., a yellowish smoke was seen to be issuing from the starboard ventilator between Nos. 3 and 2 holds. This ventilator opened into No. 2 lower hold and No. 2 'tween deck, and No. 3 lower hold and No. 3 'tween deck. Very soon thereafter some smoke was found emerging from ventilators connecting with No. 3 lower hold and 'tween deck only.

16. The First Mate saw the smoke, reported immediately to the Captain and put on the steam in the fire smothering apparatus in the No. 3 hatch. The covers were put on the ventilators of the No. 3 hatch because of the steam which had been put on in the hold. The hoses were clear and water received immediately on the deck. The ship's agent was on board shortly and the firemen from shore were immediately in position with their hoses. Since an explosion was feared, the Captain decided in consultation with the agent and firemen that the hatch boards on the fore end of the starboard hatch where it was presumed the fire burned most should be opened. Four hatch boards were taken off. Immediately yellow smoke came up out of the hatches with suffocating gas. The firemen began soon to use their hoses from shore but the air was so suffocating that they had to give up because they didn't have gas masks. The fire became worse and worse and an explosion threw burning hatch boards and things over the bridge and afterdeck. The Captain gave orders that then all men should abandon ship. A tug boat came and towed the ship out of the harbor.

17. While being towed the ship grounded on a sand bank. The cargo continued to burn vigorously so that she could not be boarded. About 5:35 P.M., an explosion took place which totally destroyed the ship with the exception of a small part of the stern.

18. While the cause of the fire has not been proven beyond a reasonable doubt, I conclude and find from the evidence considered as a whole that the preponderance of the evidence fairly establishes the finding of fact that the fire originated by spontaneous combustion in the Fgan stored in the No. 3 lower hold.

19. The Texas City disaster of April 16, 1947 brought prominently and conspicuously to public notice the subject of the use of ammonium nitrate as a fertilizer. It is said that utility of ammonium nitrate for that purpose was appreciated shortly after the military phases of the last World War. Ammonium nitrate had been made in large quantities for gunfire explosives at Government Ordnance Depots. The necessities of the war had required the manufacture of this substance in very large quantities and there were facilities for its continued manufacture in large quantities. In 1946 the value and importance of the substance for fertilization of lands devasted by war, especially in France, was realized and considerable quantities of it were transported from this country to countries abroad. It is said that this utility of ammonium nitrate had been known even since shortly after World War I. It was found that pure ammonium nitrate could be used more readily for spreading purposes on land if another substance was added to facilitate its flow from agricultural implements. One such substance that has been so used to facilitate free flowing of the fertilizer from agricultural implements is a coating of paraffin. A sample of the ammonium nitrate fertilizer loaded on the Ocean Liberty at Baltimore was taken by an officer of the Baltimore Fire Department at the time. In 1951 it was analyzed by Mr. Berretta, chemist employed by Penniman & Brown, Analytical Chemists of Baltimore. He found that the sample showed about 95% pure ammonium nitrate, 3.24% inert matter and .67% of a waxy material (apparently to serve as a free flowing agent) which had the characteristics of an organic

oxidizing material, meaning a material that will burn, but that the flash point was unpredictable.

20. Scientific characteristics of ammonium nitrate fertilizer are more widely known now than before the Texas City disaster. In June 1948 the United States Bureau of Mines issued an information circular about ammonium nitrate and ammonium nitrate fertilizer with a summary, after reviewing the results of various experimental observations by different investigators and their conclusions, many of which were made known prior to the Texas City disaster. From this summary the following properties are noted: "(1) Chemically pure ammonium nitrate does not decompose spontaneously at ordinary temperatures; (2) It is an oxidizing agent and, as such, may react with reducing materials, such as carbonaceous matter, certain metals, phosphorus, sulphur, etc. Such mixtures may lead to spontaneous heating and the temperature at which this may take place is governed by the specific materials concerned and their environment. With certain mixtures and the proper environment, spontaneous heating can occur at ordinary temperatures; (3) The quantity of ammonium nitrate that can be detonated by initiation depends upon the geometry, confinement, temperature, packing density, nature and quantities of any impurities present, and strength of the booster charge; (4) It is considered very difficult to detonate by ordinary impact or friction, although some experimental results appear to be at variance with others; (5) When heated unconfined, it merely effervesces and leaves little, if any, residue; (6) When heated under confinement, or partial confinement, it may explode. The temperature at which explosion occurs is affected by a number of factors, such as the container, heating rate, and impurities present. For pure ammonium nitrate, temperatures from 300 degrees to 350 degrees C. have been variously reported. The temperature is lowered by the presence of certain impurities. Pressures necessary for explosion have not been determined."

On pages 17 and 18 of the circular there is more particularly discussed the subject of spontaneous heating in which it is said in part: "As far as is known, there is no recorded instance of spontaneous heating in pure ammonium nitrate. * * * However, in the presence of foreign material, spontaneous heating may take place, depending upon the conditions, such as quantity, temperature, insulating properties, nature of the foreign material, etc."

Particular instances of ship transportation of ammonium nitrate fertilizer are referred to and it is said (p. 18): "When initially at 150 degrees C. ammonium nitrate fertilizer plus 10 percent sawdust can ignite in 50 minutes. (75) The paraffin-type coating materials used in the manufacture of ammonium nitrate fertilizer apparently make little or no contribution to spontaneous heating. T. H. Wilde, quoted by Davis (34) observed no change in temperature in 2 weeks in ammonium nitrate containing 0.5 percent petrolatum-rosin-paraffin wax stored in a thermos bottle at 60 degrees C. According to plant experience (56), fertilizer packed in the multiwalled paper bags at 93 degrees C. (199 degrees F.) does not heat further. If packed at 104 degrees C. (219 degrees F.) and loaded promptly into railroad cars, the asphalt in the bags begins to 'bleed'. If packed at 110 degrees C. (230 degrees F.), the insides of the bags show charring, particularly if heat losses are minimized. At 118 degrees C. (244 degrees F.) the three inner sheets are considerably weakened by charring and embrittlement. At 150 degrees C. (302 degrees F.) simulated bags ignited spontaneously in 5 or 6 hours. Experimental work (75) has shown that at 100 degrees C. (212 degrees F.) there was little or no reaction in ammonium nitrate fertilizer—bag paper mixture occurs in 16 days. At 100 degrees C. (212 degrees F.) there was little or no reaction, but at 120 degrees C. (248 degrees F.) the ammonium nitrate was found to react markedly with bag paper, sawdust, iron powder, or sawdust and oil."

Dr. Kistiakowsky, a Harvard Professor of Chemistry who has specialized in the effects of heating of various chemicals (who also testified in the torts claims suits against the United States growing out of the Texas City disaster) testified as a wit-

ness for the libellants in this case. According to laboratory experiments made by him in 1948 he concluded that a 1% admixture of waxy coating for the granules of ammonium nitrate had the effect of increasing the tendency of ammonium nitrate fertilizer to spontaneous combustion and he adopted what he referred to as the "critical mass" theory of spontaneous combustion which is to the effect that large masses of it in close confinement, as in a ship's hold, without unusually good ventilation tend to overheating and spontaneous combustion. Dr. Kistiakowsky also said that if the percentage amount of paraffin coating was increased from 1% to 5% it would greatly minimize the tendency to self-heating. He instances the case of Nitrammon made by the Dupont Company which is 95% ammonium nitrate with 5% wax and is fairly safe and that by reason of its safety factor Nitrammon's transportation rate was much lowered. He and also Dr. Snell, another analytical chemist, testifying for the libellants, expressed the view that the scientific literature about ammonium nitrate prior to July 1, 1947 was to the effect that ammonium nitrate fertilizer was susceptible to spontaneous heating and combustion under certain conditions, among which were contact with certain metals, such as zinc, or when confined in too large areas without adequate ventilation. They referred particularly to the U. S. Ordnance Safety Manual issued in 1945 and the U. S. Department of Agriculture Circular, 719, headed "Explosibility and Fire Hazard of Ammonium Nitrate Fertilizer" issued in March 1945. Attention was called to what was said on page 22 on the subject of safety measures, that "Bearing in mind that ammonium nitrate is an explosive and supports combustion, it should be handled in such a way as to avoid conditions that may make it dangerous. More than ordinary caution should be practised along the lines indicated * * *."

Respondents called no expert scientific witnesses on their behalf.

21. Consequent upon the Texas City disaster there were appointed representatives of various departments of the Government and others to consider what should be the policy with respect to future transportation on board vessels of ammonium nitrate fertilizer. The departments or agencies represented were the Navy Department; War Department; Army and Navy Explosives Safety Board; United States Maritime Commission; Treasury Department (United States Coast Guard); Association American Railroads; Interstate Commerce Commission; Department of Agriculture; Department of Commerce and Department of the Interior. This is called the Inter-Agency Report (Res.Ex. No.12). The Report announces as policy that ammonium nitrate fertilizer was a very valuable commodity for agricultural purposes with particular reference to the restoration of war devastated areas and that while it was a dangerous commodity, it could be transported with safety if careful precautions were taken especially against the possibility of fire which, it is said, was the greatest hazard to it in vessel transportation. This Report concluded that there was no danger of explosion if temperatures below 200 degrees F. were maintained.

22. After the fire and explosion on the Ocean Liberty on July 28, 1947 in the Harbor of Brest, the United States Coast Guard amended its regulation with respect to the shipment of ammonium nitrate fertilizer by providing in effect that it could be shipped only after obtaining a special permit therefor if more than 500 lbs. was to be shipped at one time and that inquiry should be made before issuing the permit whether the place of shipment was in a congested area, and if so, the permit should be issued only on condition that the loading be made at a port or point removed from such area.

23. Promptly after the Texas City disaster the investigations as to the cause of the fire and explosion and the nature and characteristics of ammonium nitrate fertilizer were made by the National Board of Fire Underwriters. A report upon the subject was issued and widely circulated prior to the sailing of the Ocean Liberty in this case (Libellants Ex.No.11). It referred historically to a number of serious fire

and explosion incidents of ammonium nitrate in 1918, 1921, 1924 and 1925. On page 44 it made a number of recommendations with regard to the storage, handling and fire fighting of ammonium nitrate. Those seemingly pertinent here are as follows:

"3. Piles of ammonium nitrate in paper bags in storage should not exceed 10 bags * * * high, 6 bags wide * * * and 30 bags long * * * with 3 foot separation between piles and with handling aisles of 10 feet every 100 feet. Separation specified is necessary for inspections and fire fighting operations.

"5. Ship's holds or boxcars must be thoroughly clean before loading operations are begun.

"6. Spilled material in the hold, cars or on dock and discarded sacks must be removed immediately and disposed of in a safe manner as described in 4 above. Any spilled material on docks should be flushed off thoroughly with water.

"7. Proper dunnage and sweat-boards must be used in ship's hold and box cars to prevent friction and to *allow for circulating of air.* (Italics supplied.)

"8. Smoking or the use of open lights must be strictly prohibited at any time.

"9. Other cargo must not be placed in the same hold with ammonium nitrate.

"10. Keep material clear of all steam lines and wiring."

I find from the evidence that the scientific data prior to July 1947 contained in various reports, treatises and text books discloses that Fgan presented a serious danger of spontaneous ignition under certain conditions. While these conditions were not precisely and definitely determined, very important considerations related to contacts with certain foreign substances especially if of carbonaceous matter, the temperature of initial storage, quantity or mass when stored, and when confined without adequate ventilation. That is to say, the danger of spontaneous combustion was increased if organic matter was mixed with Fgan, with increased temperature when stowed in large masses and that the greater the mass and the length of confinement would increase the danger; while lessening the mass with adequate ventilation would decrease the danger of spontaneous combustion.

24. Apparently the New York officers of the Cosmopolitan Shipping Company did not receive or have a copy of this circular before the loading of the Ocean Liberty was done at Baltimore by the Terminal Shipping Company, a subagent of the Cosmopolitan Shipping Company. The loading was done under the supervision of the United States Coast Guard, the Baltimore City Fire Department and the New York Board of Underwriters. Deputy Chief Trenner represented the Baltimore City Fire Department at the loading of the Ocean Liberty. He had received and was familiar with the recommendations above mentioned which indeed had been officially put into effect for Baltimore by a City Ordinance on June 17, 1947. It was his observation that the loading of the ammonium nitrate on the Ocean Liberty properly conformed to these recommendations. The United States Coast Guard is the governmental agency particularly charged with supervision of loading of dangerous materials on ships. The New York Board of Underwriters is, of course, a private agency which, among its other activities, on request and for a small fee, inspects or supervises loading of ships and issues an inspection certificate when satisfactory. This was done in this case.

It is to be noted that at this time at least there were no governmental regulations against the storage and shipment by railroad or ship of ammonium nitrate fertilizer, despite the Texas City disaster. Nor was there any recommendation that it should not be transported, although the necessity for very extra care and precaution in the handling and storing of it was greatly emphasized.

25. Before accepting the ammonium nitrate fertilizer as cargo for the Ocean Liberty the Cosmopolitan Company cabled Mowinckels asking whether they should accept. This was evidently in view of the recent Texas City disaster. Mowinckels cabled back authorizing acceptance.

On June 11, 1947 Cosmopolitan wrote to its Baltimore agents, Terminal Shipping Company, stating that 4,000 tons of ammonium nitrate (fertilizer) was to be loaded on the Ocean Liberty at Baltimore, and added: "Prior to loading please see that the compartments are absolutely clean. Dunnage must be laid not only on tank tops and ceiling but also on bilge ceilings. During the loading operations have fire hose stretched and do not allow anyone to smoke in holds or on deck. The stevedore should instruct his men to handle hatch beams carefully to avoid sparks. In tween decks it will be necessary to leave sufficient headroom for air circulation. For other details and regulations you will consult the U. S. Coast Guard who must be notified and under whose direction this commodity is loaded."

26. The cargo owners in these cases contend, and I have found as an inference from all the available facts, that the fire on the Ocean Liberty was caused by spontaneous combustion of the Fgan. An important question of fact affecting the liability of the carrier in this case is whether the carrier knew or by the exercise of due care should have known that Fgan as stowed on the Ocean Liberty was likely to explode as a result of spontaneous combustion. It is clear enough on the evidence that the carrier in accepting Fgan knew that it was dealing with a very dangerous chemical. For this reason unusual care was taken in the method of stowage in certain respects. What was evidently known to the carrier was that a great danger would arise from any fire. And in this respect I find from the evidence that the recommended precautions to avoid fire in stowage were carefully complied with. Thus contact between the paper bags and the metal portions of the hold were avoided by wooden dunnage and paper dunnage thereover. And finally there was over the whole mass of the stow placed a waterproof covering. The tween deck hatches were also closed and after the loading of general cargo in New York the deck hatches in number 3 tween deck were closed. But on the other hand the bags were placed tier upon tier to the number of 20 or more

and they were stowed solidly without wooden or other dunnage forming any separation either horizontally or vertically between them to give extraordinary ventilation. In effect, therefore, the stowage of the fertilizer was adequate to and did successfully prevent fire originating in the loading outside of the stow. But unfortunately the extra care and precaution in avoiding the possibility of fire from outside the fertilizer resulted in exactly those conditions which greatly increased the danger of fire from within, that is, spontaneous combustion. I find as a fact that neither the carrier nor its general agents nor its subagents, nor for that matter neither the representatives of the Coast Guard, the Fire Department or the New York Board of Underwriters, knew that Fgan was, as so stowed, subject to spontaneous combustion. In stowing it or permitting it to be stowed as they did, what they had in mind was protection against fire originating from outside. They entirely overlooked the necessity of guarding against fire from within the fertilizer itself by spontaneous combustion. The dominant issue of fact thus becomes whether the carrier or its agents could by diligent inquiry have learned of the danger of spontaneous combustion, and if so, should they have made such inquiry. I find on all the evidence that if the carrier exercised due diligence to make inquiry as to the nature and properties of Fgan it could have learned that it was susceptible to spontaneous combustion when stowed in large quantities in a very confined space without free circulation of air. In this case neither the carrier nor its general agents made any particular inquiry with regard to this feature of ship carriage of Fgan, despite the very great danger involved in the carriage of the fertilizer as so recently brought to their knowledge and attention by the Texas City disaster. Apparently they did not even obtain a copy of the very widely distributed report by the National Board of Fire Underwriters on the Texas City disaster which, while not specifically stating that the fertilizer was susceptible to spontaneous combustion, did, however, clearly indicate the importance of adequate ventilation. The

inquiry that they did make seems to have been limited to ascertaining from the Coast Guard whether there was then any existing prohibition against ship carriage of Fgan and after learning that there was none, they relied too largely on only inspection of the loading by public officials.

27. The libellants contend that the method of stowage of Fgan in No. 3 lower hold was negligent in other respects than insufficient ventilation, but I do not so find from the evidence. Stowage on the Ocean Liberty was in all substantial respects similar to that which had been used in the loading of 10 or 12 other ships, some before and some after the loss of the Ocean Liberty. The loading of these ships was also supervised by the three official agencies. The evidence is satisfactory that their requirements were complied with. Counsel for the libellants also contend that some or much of the Fgan stowed in No. 3 hold was hot at the time. There was evidence to the effect that Fgan was packed at the Ordnance Plant before shipment at a temperature of about 180 degrees F. When some of the railroad cars were opened for transfer of the Fgan from the cars to the ship, some of the bags were hot or warm but they were allowed to cool off before being stowed on the ship. The bags were, however, solidly stowed in the hold as was customary with bagged material of other kinds such as coffee, sugar, etc., and without giving consideration to the characteristics of Fgan. They were placed bag on bag up to within two feet of the top of the hold. The bags were of six-ply heavy paper and labeled:

"Fertilizer
(ammonium nitrate)
32.5% Nitrogen
100 lbs net
101.5 lbs Gross
1.6 cu. ft.
Made in U. S. A."

As the whole mass of bags was completely surrounded with heavy paper on all sides placed over the wooden dunnage and with waterproof paper over the top of the whole mass, it seems evident that the only possible circulation of air was within the two foot space above the bags. The ship was equipped with the standard deck ventilating system communicating with the hold. The ventilators had double layers of mesh over them to protect from outside foreign agencies. No rice ventilators were used to make aisles within the solid stow such as were known and used with respect to some other commodities, such as fish meal. It apparently was not thought of as customary with bagged fertilizer.

28. In accepting the Fgan without particular inquiry as to its peculiar characteristics, and stowing it in a solid mass in No. 3 hold and without adequate ventilation, the ship was made unseaworthy on her departure from New York. When the ship arrived at Brest she lay at the dock for four successive days in unusually hot weather in mid-summer and this may possibly have been the final straw that caused the igniting of the fertilizer by spontaneous combustion. The fire and explosion which resulted and damaged or destroyed the libellants' goods was the direct result of failure of the carrier to exercise due diligence to make the ship seaworthy. The cargoes of the libellants involved in these cases do not include any of the fertilizer, the original libels for which filed in this court were subsequently dismissed by counsel for those libellants.

29. Libellants contend that when the Ocean Liberty went first to Brest instead of Antwerp, that was an unreasonable deviation from the planned voyage which made the carrier thereafter an insurer of the cargo. Most of the facts with regard to calling at Brest have been above stated. Other facts which I find are as follows: It is customary for vessels of the Cosmopolitan Line to sail from New York directly to Antwerp and thereafter to the French ports of Cherbourg, LeHavre and Boulogne in that order. Long before the Ocean Liberty sailed from New York Cosmopolitan advertised that the Ocean Liberty would sail directly from New York to Antwerp and thereafter to French ports. Under Cosmopolitan's direction the vessel was cleared at the New York Customs House and sailed directly from New York for Antwerp and thereafter to Cherbourg, LeHavre and Boulogne. No vessel of the

Cosmopolitan Line had ever before called at Brest nor is there any evidence that the vessels of any other line engaged in the carriage of cargo between United States ports and Antwerp, Cherbourg, LeHavre and Boulogne customarily put in at Brest.

30. The direct course to Antwerp takes a vessel to a point some ten miles off Bishop's Rock at the entrance to the English Channel. The course from the landfall off Bishop's Rock to Antwerp is in a northeasterly direction 450 miles in length. The course to Brest from said landfall is southeasterly and 134 miles in length. Brest is 485 miles from Antwerp.

31. Originally 850 tons of cargo had been destined for Antwerp, 983 tons for Cherbourg, 1453 tons for LeHavre and 4501 tons for Boulogne. As to the cargo destined for French ports: All of the Boulogne cargo was French Government controlled, most of it consisting of Fgan. The Cherbourg cargo consisted of all French Government controlled cargo, including the gondolas which were re-directed to Brest. Steel trucks which were French Government controlled cargo, made up much of the LeHavre cargo and the remainder was private cargo.

Although clean bills of lading were issued by respondents approximately 32,000 cu. ft. of cargo consisting of chemicals, gondolas, automobiles and bus chassis, amounting to almost 300 tons, were carried on deck. Much of it was Antwerp cargo. During the unloading at Brest all of the deck cargo and some cargo from holds 2 and 4 and No. 5 'tween deck had been unloaded. Most of the Antwerp and some of the LeHavre cargo had been removed to warehouses or placed on piers, while some of the gondolas which were intended for Brest were afloat nearby on barges, when the fire started.

The temperature that day was about 25 degrees centigrade (102 F.) and a wind was blowing from the east. Sparks were communicated to the tarred canvas roofs of the wooden warehouses on shore thus starting the fire on the piers and damaging or destroying a considerable part of the cargo on shore although stevedores and talymen saved as much as they possibly could under the circumstances.

Some time later divers were unable to find any cargo in salvagable condition in the waters where the ship had exploded. The Fgan in that part of the stern of the ship which had been in part hold No. 5, and which was left standing after the explosion, is said to have dissolved or otherwise disappeared.

32. The deviation to Brest was reasonable under all the evidence.