**THE CATERINA GEROLIMICH.**

**NAVIGAZIONE GENERALE ITALIANA v. L. HIRSHBERG & CO., Inc.**

No. 10426.

District Court, E. D. New York.
April 16, 1930.

Finkler & McEntire, of New York City (Frank I. Finkler, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. De Grove Potter and John J. Heckman, both of New York City, of counsel), for claimant and cross-libelant.

BYERS, District Judge.

On May 8, 1927, the claimant steamship sailed from Alexandria, Egypt, for the port of New York with a cargo of freight, including 10,000 bags of Egyptian onions consigned to the libelant.

Acceptance of this shipment was refused because of the condition of the onions, which were sold by the government for the sum of $100.

Of these 10,000 bags, 6,380 were condemned by the board of health, and the balance of 3,620 were acquired by the purchaser who paid the $100.

Onions composed the greater part of the cargo of the claimant on this voyage; 46,550 bags having been laden at Alexandria for delivery at New York.

The libel alleges that the onions were received on board in good order and condition, but were not so delivered, having been damaged by reason of the negligence and want of care of the owners, officers, crew and others in charge of the said steamer in respect to the loading, stowage, delivery, custody and care of the said cargo, delay in delivery, and unseaworthiness and deviation on the part of the vessel.

The point to be determined is whether the condition of the onions on their arrival in New York was due to inherent vice or to the negligence alleged in the libel.

The claimant is a steel cargo vessel, 380 feet long, with a beam of 52 feet, having six lower holds, six lower 'tween-decks and an upper 'tween-decks except at Nos. 1 and 6. On this voyage, she arrived at this port, drawing fifteen feet seven inches forward, and nineteen feet three inches aft.

The onions consigned to the libelant were stowed in bags in lower hold No. 1, and there was a clearance of about $5\frac{1}{2}$ feet, measured between the top of the onions and the top of that hold. In the forward part of the lower 'tween-decks of No. 1, there were 650 bags of sesame seed, and in the wings on either side of the hatchway there were 1,000 bags of onions, not part of the shipment in question. In the upper 'tween-decks of hold No. 2, there were 2,700 bags of onions, also of another shipment, and in the lower 'tween-decks of the same hold there were 8,250 bags, and the lower hold No. 2 was more than half filled with onions, also in bags.

Upper 'tween-decks No. 4 and No. 5 were entirely filled with onions in bags, and hold No. 6 at lower 'tween-decks was entirely stowed with onions, and the lower hold contained 6,000 bags.

The 10,000 bags in lower hold No. 1 rested upon 40 bales of wool and 57 bales of rags, which were separated from the onions by a tarpaulin and dunnage.

The physical conditions with regard to the placing of cargo and the ventilation should be briefly described:

The hold was fitted with four permanent ventilators, the forward ones being 17 feet above the main deck, and the after ones 18 feet above the main deck. These were fitted with cowl tops 30 inches in diameter.

The shafts leading from the main deck into the 'tween-decks were 18 inches in diameter, which were telescoped into the lower holds at a diameter of 12 inches.

The lower hold compartment was fitted with spar slings or cargo battens, keeping all the bags 12 to 24 inches from the shell plating.

The lower hold was drained by the bilges through limbers. Before this cargo was loaded, an examination was made of the scup-

pers, and they were found to be in order. On this voyage, the hatches were kept one-third open continuously except for about three hours on three days when it rained.

In addition to the permanent ventilators, transportable canvas ventilators were used, namely, a large 40-foot hose about 18 to 20 inches in diameter with a cowl of canvas, attached to a stay and leading into the hold, was put down the hatch; during the early days of the voyage one of these ventilators was used alternately in No. 1 and No. 6.

After the first eleven days of the voyage had been accomplished, and for reasons hereinafter stated, one of these transportable canvas ventilators was kept in No. 1 hold throughout, and, in addition, another canvas ventilator and one constructed of wood, so that, for the greater part of this voyage, No. 1 hold was equipped with three portable ventilators as well as the four stationary ones, and the hatch covers were kept off as has been stated.

When the hatches were closed because of the rain, the canvas ventilators were taken out of the hold, but the permanent ventilators continued to function, being turned into the wind.

Throughout this particular stow of onions in the No. 1 lower hold, there were employed what are called "rice ventilators," which are constructed of boards five-eighths of an inch thick, about 10 inches wide, and about 6 feet long. Two boards are separated by a space of 8 inches, being held in place by connecting pieces. These structures were connected vertically and horizontally with one another, i. e., co-ordinated, for the purpose of creating channels throughout the stow through which air could circulate. These were placed 4 or 5 feet apart, and their presence was revealed as the cargo was discharged, according to witnesses who were present during that operation.

Two bills of lading covered 5,000 bags each of the onions in question, and, upon the face of each bill, in red ink, there appeared the following:

"Freight prepaid.

"It is specially agreed that no liability for loss or damage to and/or deterioration in onions shall attach to the master and/or owners of the Steamship even if such loss, damage and/or deterioration result from a cause for which but for this special agreement to the contrary the Steamship would have been liable."

There was also a provision that nothing in the bill of lading contained should exempt the shipowner from liability for damage occasioned by "bad stowage, by improper or insufficient dunnage, or absence of customary ventilation."

The claimant left Alexandria, Egypt, on the 8th of May, 1927, having made that port from Smyrna on the 1st of that month. The next port of call was Algiers, on the 14th of May, and there some cargo was discharged and additional cargo laden, and bunkers taken. Departure was had on May 18th for Gibraltar, where no stop was made; between Algiers and Gibraltar, a disagreeable odor arose from hold No. 1, so that a canvas ventilator was at once placed therein, and three days later the additional canvas ventilator and the wooden ventilator were added.

A couple of hundred bags were removed from the hold to available space in the 'tween-decks of No. 1 hold; the onions already there of another lot being first covered with tarpaulin. This was on May 31st, and the onions thus removed were stowed on deck or in the 'tween-decks, and on June 3d the odor was so bad that 220 of these bags were thrown overboard. Other bags were kept on deck, namely, 400 to 500 bags; of these, some were placed on that part of the hatch in the 'tween-decks connecting with the lower hold which was covered, and those bags began to leak so that a tarpaulin was placed under them to catch the drippings rather than permit the falling thereof upon the onions in the hold. This was the condition of affairs when the cargo was discharged in the port of New York.

During the process above referred to, of removing some of the onions from hold No. 1, on May 31, 1927, an examination was made of the bags and contents, and worms were discovered on the surface of the bags; these worms were about one-half an inch long and white in color, and were crawling on the outside and inside of the bags.

The bags that were removed from the hold and placed on deck were protected from the weather by a tarpaulin, and it was from that lot that the 220 bags were thrown overboard because of the bad odor from them.

The libelant offers the testimony of Captain Head, whose opinion it is that this part of the cargo of onions was not properly stowed; that these 10,000 bags should not have been in the lower hold No. 1 at all, but should have been carried in the 'tween-decks compartments as perishable cargo. His experience in handling Egyptian onions on a

freight steamship leaves something to be desired.

The opposing expert testimony offered by the claimant on this subject seems to be grounded on better experience and to be more persuasive as a matter of reason, in view of the apparently well-recognized fact that the No. 1 hold forward is the coolest in the ship, being separated from the engines by at least twice its own fore and aft dimensions and by three steel bulkheads; moreover, the temperature below water line in the late spring is certainly no higher and probably is lower than in 'tween-decks space, which is directly under the main deck of the ship.

▉ These bills of lading recite that the onions were received "in apparent good order and condition." This admission by the carrier applies to the visible aspect of the subject-matter. The Vallescura (D. C.) 43 F. (2d) 247, 1929 A. M. C. 1409.

The bills of lading do not exempt the claimant from liability for the results of bad stowage, improper or insufficient dunnage, or absence of customary ventilation; but responsibility is expressly disclaimed for loss or damage occasioned by "putrefaction, ⸤ ⁂ ⁂ sweat, change of character, etc." and it becomes necessary, therefore, to decide whether the conditions revealed during the voyage, and upon discharge of this part of the cargo, were brought to pass because of the absence of ventilation, or by putrefaction of the onions.

The testimony of a bacteriologist, who took samples of various lots of onions from this cargo, is clearly to the effect that many of the bags in this shipment were wet and contained decayed onions; the cause of the decay, in his opinion, was an infection with moulds, spores and bacteria at the time cargo was laden.

Samples of these onions were marked in evidence, the onions being contained in jars of formaldehyde, and worms such as have been previously referred to were clearly shown in considerable quantity as to onions taken from the wet bags in this lot; it will be recalled that some of the bags which were examined on May 31st showed similar worms.

If all the cargo stowed in lower holds had revealed the same conditions, there would be reason to suspect that lack of ventilation, or heat, in the lower holds might be held responsible; but the testimony is that, of the 6,000 bags of onions stowed in lower hold No. 6, only a small portion were decayed. The witness Putnam says that the damaged bags in the lower after hold did not constitute a very large quantity. He thinks these bags were covered by B/LS 1 to 3.

The witness Cameron refers to B/LS 1 and 2 as covering 1,000 bags of which 280 were condemned by the board of health. His records indicate that 7,786 bags out of the entire cargo were condemned, or something over 16 per cent., while, of this particular lot, 6,380 out of 10,000 were condemned, showing that nearly 64 per cent. were unfit for human consumption. These figures seem to indicate that it was the onions in lower hold No. 1 which were at fault, and not the method of stowage.

Examination of the bags in question, as the discharge proceeded, revealed that there were separated areas of wet bags containing decayed onions within the stow; in other words, the decayed elements did not constitute a coherent unit, either laterally or vertically. Moreover, the wet bags had a high center temperature, and many of the infected onions were diseased at the core or stem. All of these conditions are consistent with inherent vice, rather than improper stowage.

Reference should be made to libelant's contention that, because these bags of onions rested upon bales of wool and rags, heat was thereby generated which caused the decay and putrefaction shown to exist. No evidence is offered to sustain this contention.

It is fairly well known that wool does not produce heat unless it is itself in process of decomposition. There was certainly dunnage and probably also a tarpaulin separating these bales from the bags of onions, and negligence in stowing cannot be predicated on the mere fact that the cargo in the hold in question was composed in part of bales of wool and bales of rags, as well as bags of onions.

▉ There is no evidence that any heat whatever proceeded from the wool or rags, which were underneath the onions, and the fact that the bags of decayed onions were in unrelated groups throughout the stow, negatives the suggestion that the lower layers only were first heated by the wool and rags, and thereafter adversely and uniformly influenced the entire shipment. The onions which were decayed are constantly referred to by the libelant as "cooked," meaning heated to the cooking point by exterior forces. But that does not satisfactorily account for the worms discovered eleven days after sailing from Alexandria. If mere cooking were to produce worms, the entire culinary art would have to undergo fundamental revision.

Attention is sought to be diverted from

the obvious conditions thus far discussed, by the assertion that there was deviation on the part of the vessel; apparently a delay at Algiers for a matter of four to six hours, waiting for bunkers, is the basis of this contention, on the theory that enough coal should have been taken at Alexandria to meet the requirements of the voyage to New York.

██ If a matter of six hours were the determining factor in the case, this contention might require examination, but, in view of the developments of May 31, 1927, in a cargo of Egyptian onions, which are supposed to be so hardy that they will keep for many months, and are not shipped in crates, because of their sturdy characteristics, the theory of deviation, even if seriously advanced, seems not to require consideration. The claimant in this case is not shown to be responsible for the bad condition of this cargo, upon reasoning akin to that employed in The Florinda (C. C. A.) 31 F.(2d) 262, 1929 A. M. C. 417, and Cuneo Bros. v. S. S. Hog Island (U. S. D. Ct. March 14, 1930) 43 F.(2d) 243, 1930 A. M. C. 703.

██ If the claimant is not to be held responsible for the condition of the onions, fairness requires that the expense to which it was put to dispose of those bags which were condemned should be compensated. See Asuarca (D. C.) 13 F.(2d) 222.

The libel will be dismissed, with costs, and the cross-libel will be sustained, with costs, with the customary reference to a commissioner unless the amount of the damage can be agreed upon.