**A/S J. LUDWIG MOWINCKELS REDERI et al. v. ACCINANTO, Limited, et al.**

**No. 6385.**

United States Court of Appeals Fourth Circuit.

Argued April 9, 1952.

Decided Sept. 22, 1952.

Soper, Circuit Judge, dissented.

Wharton Poor, New York City, and William A. Grimes, Baltimore, Md. (Ober, Grimes & Stinson, Baltimore, Md., Haight, Deming, Gardner, Poor & Havens, and Tallman Bissell, New York City, on brief), for appellant and cross-appellees.

Henry N. Longley, New York City, (Bigham, Englar, Jones & Houston, New York City, and Lord, Whip & Coughlan, Baltimore, Md., on brief), for appellees and cross-appellants.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

These are cross appeals in suits in admiralty brought by cargo owners to recover damages arising out of the fire and explosion which destroyed the steamship Ocean Liberty and her cargo at the port of Brest in France on July 28, 1947. Libelants are the owners of cargo consigned to Antwerp or LeHavre. Respondents are A/S J. Ludwig Mowinckels Rederi (hereafter called Mowinckels) the charterer of the vessel and its general agent, the Cosmopolitan Shipping Company (hereafter called Cosmopolitan). Recovery was asked on the grounds that the fire and explosion which caused the destruction of vessel and cargo were the result of spontaneous combustion due to negligence in the stowage of a portion of the cargo consisting of ammonium nitrate, fertilizer grade (hereafter called Fgan) in the vessel's hold and that there had been a deviation in the voyage rendering respondents liable as insurers of the cargo. Respondents denied that the fire and explosion were due to spontaneous combustion or to improper stowage of the Fgan or that they were liable as insurers and relied upon the provisions of the Fire Statute, 46 U.S.C.A. § 182, and the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2)(b). The District Judge found that there was no deviation but that there was spontaneous combustion of the Fgan due to negligence in its stowage for which there was liability on the part of Mowinckels but not on the part of Cosmopolitan. See D.C., 99 F.Supp. 261. From this decision both Mowinckels and the cargo owners have appealed. In the view that we take of the case three questions are presented for our consideration: (1) Was the fire and explosion which destroyed the cargo due to the spontaneous combustion of the Fgan? (2) If so, was this the result of negligence in the stowage of the Fgan for which Mowinckels or its agent Cosmopolitian are liable? (3) Was there a deviation in the course of the vessel rendering Mowinckels liable as an insurer of the cargo?

Mowinckels operates vessels between the United States North Atlantic ports and Antwerp and the Northern French ports, in a service known as the Cosmopolitan Line; and Cosmopolitan Shipping Company, Inc., is general agent for the line in New York. The Ocean Liberty was chartered by Mowinckels for one voyage and arrived in Baltimore on June 28, 1947, to take on cargo. The loading was done by Terminal Shipping Company, a competent stevedore company at the port of Baltimore which was employed for this purpose by Cosmopolitan.

Before the loading began, unusual precautions were taken because a large part of the cargo consisted of 3309 tons of Fgan, and a recent disastrous fire and explosion on ships at Texas City had given warning that danger from the handling of this material was to be anticipated. The ship was inspected upon her arrival in Baltimore by representatives of the United States Coast Guard, the Baltimore Fire Department and the Board of Underwriters of New York, and at their direction the holds of the vessel were thoroughly washed. Loading began on June 30 and was completed on July 5. The stowage of Fgan was done under the supervision and in accordance with the directions of the same authorities and in substantially the same manner as other ships had been loaded with Fgan under their direction. Large quantities of Fgan had theretofore been safely loaded at Baltimore and other United States ports and safely carried to foreign ports in Europe and Asia.[1] The judge found that the directions of the fire preventive authorities were duly observed and that as the result of these precautions the stowage was sufficient to prevent fire from originating outside of the fertilizer, but that these extra precautions increased the danger from spontaneous combustion within the material.

The fire originated in the fertilizer in No. 3 hold. This hold was 47'6" fore and aft between stiffeners, 54'7" athwart ship between cargo battens, and 24'3½" in depth.

<hr/>

1. The evidence identifies twenty or twenty-one ships stowed in substantially the same way as the Ocean Liberty. Fifteen of these were loaded in Baltimore in the first half of 1947 and five or six near New Orleans in 1949 and 1950.

There was a hatch opening 20' square from the hold into the 'tween deck space. In this hold were stowed 1381 tons of Fgan contained in 30,480 multiwall paper bags weighing about 100 pounds each and occupying a space of 1.6 cubic feet per bag. In addition 739 tons of Fgan were stowed in lower hold No. 1 and 1189 tons in lower hold No. 5. No other cargo was placed in these holds and after the nitrate was loaded the holds were closed and none of the 'tween deck hatches were thereafter opened.

The bags were placed solidly tier upon tier to the number of 20 or more in hold No. 3. There was dunnage separating the bags from the cargo battens and a layer of dunnage underneath. This dunnage was employed to keep the bags from coming in contact with iron work and from being torn and spilling the contents, and also to protect the bags from condensation of moisture. There was an air space of 2 feet between the top tier of bags and the ceiling of the hold. The whole mass of bags, however, was completely surrounded with heavy paper on all sides placed over the wooden dunnage and also with waterproof paper over the top of the mass so that the only possible circulation of air in the hold was within the space above the bags or in the space between the battens and the skin of the ship. Thus, hold No. 3 contained a solid mass of stowage of Fgan from the forward bulkhead to the after bulkhead and from the batten boards on one side of the ship to the batten boards on the other side of the ship. The ship was equipped with a standard ventilation system communicating with the holds but there was no free circulation of air through the mass of the nitrate.

After the lower holds of the ship were loaded with Fgan, the vessel proceeded to New York where she took on additional cargo. She left New York on July 11 with a total cargo of 7787 tons on board of which 850 tons were to be discharged at Antwerp and the balance at French ports, and it was expected that her first port of call would be Antwerp. A wildcat strike of longshoremen, however, broke out at Antwerp on July 18, 1947 and was not over until July 31. If the vessel had proceeded first to Antwerp, she would have arrived on July 24 when the strike was at its height, and the discharge of the vessel would have been practically impossible. On July 22 the French government, for which a great part of the cargo was shipped, directed that the ship should discharge the cargo intended for French ports, first at Brest and then at Cherbourg. Because of this order and of the strike at Antwerp the ship proceeded to Brest where she arrived on July 23.

A considerable part of the Antwerp cargo and some of the Havre cargo were first discharged in order to facilitate the discharge of other cargo required by the French government. The discharge proceeded until July 28, 1947 when at 12:30 P.M. a yellowish smoke was seen to be issuing from the starboard ventilator which opened into both No. 2 and No. 3 holds. Very soon thereafter smoke was seen emerging from ventilators connected with No. 3 lower hold and 'tween deck only. The officers of the ship put on steam in the fire smothering apparatus in the No. 3 hatch and covered the ventilator of the hatch. Since an explosion was feared the hatchboards on the fore end of the starboard hatch were opened and immediately yellow smoke came out of the hatch with suffocating gas. The fire became worse and worse and the men were ordered to abandon ship. A tug boat towed the ship out of the harbor and it was grounded on a sand bank. The cargo continued to burn vigorously until about 5:35 P.M. when an explosion took place which totally destroyed the ship with the exception of a small part of the stern.

The District Judge found that the cause of the fire had not been proved beyond a reasonable doubt but that the preponderance of the evidence fairly established the conclusion that the fire originated by spontaneous combustion of Fgan in No. 3 lower hold. That the fire began in this hold is convincingly shown by entries in the ship's logs and by the testimony of carrier's witnesses to the effect that heavy yellow smoke with suffocating gas came out of the hold, when the fire was first discovered, and also by testimony of these witnesses that it was not possible for the fire to have entered

from the outside because the hatches were tightly closed and the ventilators were covered by two layers of fine steel mesh.

There is considerable doubt as to whether the fire was due to spontaneous ignition or combustion or, if so, whether this was the result of lack of ventilation in the stowage; but, in the light of the expert testimony given in the case as to the danger of spontaneous ignition of Fgan when stored in large masses without adequate ventilation, we think that this furnishes the most plausible theory of the origin of the fire that has been advanced. At all events we do not think that we would be justified in holding that the finding of the trial judge to that effect is clearly wrong and consequently accept that finding.

We do not think, however, that there is adequate support for the finding that there was negligence in the stowage of the Fgan or for holding Mowinckels liable because of such stowage. In the first place, we do not think that in the light of knowledge existing at the time it can be said that there was negligence or lack of ordinary care in the stowage. Fgan was a new chemical product, sold as a commercial fertilizer, and its propensity for generating heat with danger of spontaneous ignition or combustion was not known to the shipping world. Even the chemical experts upon whose testimony the finding of the trial judge was based do not claim to have had any experience with Fgan at that time and had given no study to it prior to the Texas City disaster. The most that they attempted to say with respect to prior knowledge was that it was known that ammonium nitrate would heat when brought in contact with carbonaceous substances and from this they reasoned that, since the wax coating and paper bags were carbonaceous substances with which the ammonium nitrate was in contact, this accounted for the fire and explosion. Even they do not say that at the time of the loading of the Ocean Liberty there was any scientific teaching to the effect that Fgan was likely to heat because of its wax coating or that it was dangerous to stow it in paper bags, or that it was customary to give

it any greater ventilation than other bagged cargo. In other words, the prior knowledge to which these expert witnesses testified was scientific knowledge with respect to ammonium nitrate and its qualities, having no reference whatever to Fgan and its handling as a commercial product. To say that the qualities of Fgan were known because of the scientific knowledge with respect to ammonium nitrate is like saying that a chemical patent is anticipated by prior knowledge with regard to the chemicals which are its constituent elements.

On the other hand, there was evidence that the scientific knowledge available with respect to Fgan, as distinguished from ammonium nitrate, at the time of the loading was to the effect that there was no danger of heating because of the wax coating. A circular of the United States Department of Agriculture issued in March 1945 stated the conclusion of one Wilde, based on experiments at the Soil and Fertilizer Laboratory, that there was no evidence to support the theory of the oxidation of the organic coating material with resultant heating and that the addition of 0.5 percent wax should have no adverse effect on the material as regards the likelihood of spontaneous ignition—that in tests made there was no indication of spontaneous heating in the samples with wax or resin coating or in the untreated material. This finding of Wilde was considered sufficiently current and authentic to be included in the Bureau of Mines information circular issued in June 1948. A report made by the Picatinny Arsenal in July 1947 of experiments following the Texas City disaster states "The temperature required to cause the spontaneous ignition of bagged nitrate fertilizer has been found to be so high (150 degrees centigrade) as to indicate the improbability of this being the origin of the fire on board the 'Grand Camp'". The report of the Interagency Committee, appointed under the authority of the Treasury, of August 1947, states: "Limited tests and experience indicate that ammonium nitrate fertilizer of the type involved in the Texas City disaster, stowed as cargo in holds of ships, does not heat spontaneously when the temperature of the

fertilizer at the time of loading does not exceed 140 degrees fahrenheit". (The testimony is uncontradicted that the temperature at the time of loading did not exceed 100 degrees fahrenheit and the trial judge so found). It was stated as a conclusion in this report that "fire caused by the carelessness of men smoking" was believed to be the primary cause of the Texas City disaster, and this was based upon an investigation made by the Coast Guard immediately following the disaster. Captain Carter, the representative of the Board of Underwriters of New York, under whose directions the ship was loaded, had this to say with regard to the technical evidence then available:

> "Well, first of all, regarding the heating, or spontaneous combustion, frankly, I don't know of any technical evidence which will indicate that ammonium nitrate will heat of its own accord and break into fire. Now the technical evidence does show that at temperatures above 300 degrees it will decompose. In that respect I understand that the ordnance depots that manufacture ammonium nitrate bag it at a temperature of nearly 180 degrees when they put it in the bags. We found that when it arrived in the railroad cars for the steamer Golden West and when it was exposed to the air did cool off, but I know of no positive information that will show that ammonium nitrate will heat of its own accord similar to fish meal, so in the light of what information is available I think that the ventilation problem on the Ocean Liberty was adequately taken care of. Now, it may be proven later that it wasn't. I am speaking about what is known about ammonium nitrate now. * * * It was my understanding that it (ammonium nitrate fertilizer) was not self heating."

The shipping world was greatly shocked as a result of the Texas City disaster and a careful study was made by the National Board of Fire Underwriters into the causes of the disaster. The Board circulated a report in May following giving all that could be learned about the dangers of Fgan and making recommendations as to how it should be handled. This report was given wide circulation throughout the country. Nowhere is there any suggestion in it that Fgan is more dangerous than pure ammonium nitrate or that there was any danger of stowing it in paper bags. Only the most general recommendation about proper ventilation was given; and there was no suggestion that rice ventilators should be used to provide ventilation in the mass or that cargo of Fgan should be stowed in any other way than other bagged cargo.[2] The report contained fourteen recommendations dealing with such matters as cleaning the hold, screening ventilators, having fire hose connected during loading, prohibiting smoking, covering galvanized materials, keeping separate from coal, cotton and phosphates, etc. The only one of the recommendations having any reference to ventilation was as follows: "Proper dunnage and sweat boards must be used in ship's hold and box cars to prevent friction and to allow for circulating of air". A recommendation with respect to storage in warehouses provided that piles should not be more than 10 bags high, 6 bags wide and 30 bags long, with 3 feet separation between piles and with handling aisles of 10 feet every 100 feet, with the statement "Separation specified is for inspections and fire fighting operations". This recommendation manifestly was intended to have no application to stowage on shipboard.

Following this report of the National Board of Fire Underwriters, the Board of Underwriters of New York, an organization representing a large number of marine in-

2. The trial judge states in his findings of fact that "No rice ventilators were used to make aisles within the solid stow such as were known and used with respect to some other commodities such as fish meal. It apparently was not thought of as customary with bagged fertilizer". There is no evidence that rice ventilators or other similar device was ever used in the stowage of Fgan. The Interagency Committee in its report of August 1947 made no such recommendation, although it dealt in great detail with the subject of stowage of Fgan on vessels.

surers, issued recommendations for the handling of Fgan evidently based upon the report and recommendations of the National Board of Fire Underwriters and practically repeating those recommendations. There was no recommendation that Fgan be not handled in paper bags or that it be stowed in any different manner from that which had been customary. The only one of the 14 recommendations at all pertinent was number 8, which provided: "8. For the present no restriction as to the height to be carried. However, cargo should be so stowed to allow a free circulation of air." If this had been intended to require ventilation through the mass of the stowed cargo by rice ventilators or other means, this surely would have been clearly stated. It seems to relate to the height of the stacks and to forbid their being carried so high as to cut off free circulation of air to the hold. The precautionary measures set forth in both of these sets of recommendations were designed to guard against all hazards which were known to exist with respect to the handling of nitrate; and it is most significant that all relate to the danger of fire from outside sources or from the reaction with zinc or other foreign matter and not a one of them suggests danger from internal heating. When the underwriters upon whom the losses from improper loading would fall have made careful study and issued instructions with no suggestion that there was danger from internal heating, it would be unreasonable to hold that carriers and stevedores for whose guidance the instructions were issued should have anticipated the danger.

Because Fgan was being shipped from the port of Baltimore and because the Texas City disaster had called attention to the danger of handling it, a meeting was held several weeks before the loading of the Ocean Liberty to discuss the handling of Fgan. This meeting was attended by steamship agents, representatives of the Board of Underwriters of New York, representatives of the United States Coast Guard and representatives of the fire prevention branch of the Baltimore City Fire Department. The meeting was addressed by an expert chemist; and the conclusion reached was that there was no danger in handling Fgan if proper precautions were taken to guard against fire. No suggestion was made that Fgan was not to be stowed in paper bags or that it was to be stowed in any other way than other bagged cargo was stowed. The Baltimore Fire Department enacted an ordinance covering the matter, which embraced verbatim the recommendations of the National Board of Fire Underwriters, and the terms of this ordinance were enforced. A number of ships, including the Ocean Liberty, were loaded with Fgan following the adoption of the ordinance in accordance with its terms. All of them were loaded as in the case of other bagged cargo without any special ventilation of the mass of bags piled bag on bag.

When the Fgan was offered to Cosmopolitan for shipment, it made inquiry and found that the shipment was permitted. It then contracted for Mowinckels with the Terminal Shipping Company, a reputable and experienced stevedoring company, to do the loading and stipulated that the loading be done in accordance with the regulations and directions of the U. S. Coast Guard, the Baltimore City Fire Department and the Board of Underwriters of New York and under their supervision. The loading was in fact done under the supervision of representatives of these agencies, and the representative of the Board of Underwriters of New York gave a certificate that, so far as it came under his observation, the cargo had been loaded and stowed on the vessel in accordance with the rules of the Board of Underwriters. The president of the Terminal Shipping Company and its general manager who had the loading in charge had attended the meeting in Baltimore a few weeks before, in which the danger problems connected with the handling of Fgan had been discussed. The loading was done under the supervision of the same officials that had supervised the loading of other vessels with Fgan in the port of Baltimore; and they testified unequivocally that there was no difference in the way that the Ocean Liberty and the other vessels were loaded, that none of the safety

regulations provided for their guidance were violated and that they regarded the stowage as proper.

 Whether the loading was proper in the light of subsequent knowledge or not, it is difficult to see what precautions the Terminal Shipping Company did not take that it should have taken in the light of knowledge then existing. It followed the instructions of the Fire Department and the Board of Underwriters based on knowledge acquired from the Texas City disaster, and what it did had the approval of the Coast Guard whose sole interest in the matter was the protection of shipping. If it had sought the advice of the chemical experts upon whose testimony the cargo owners rely, it might or might not have received different instructions. Stevedores and carriers should be held to a high degree of care in ascertaining the dangers inherent in cargo that they are handling; but surely they are not to be held negligent when they seek and follow the advice of expert and experienced agencies such as the Coast Guard, the Fire Department and the Board of Underwriters, instead of mapping out rules of their own based upon consultation with academic experts.

It should be remembered, in this connection, that the Interagency Committee to whose report reference has heretofore been made was appointed by the Secretary of the Treasury immediately following the Texas City disaster "to study every possible hazardous aspect of ammonium nitrate and develop additional information relative to such hazards in transportation, handling and stowage and to recommend a national policy in conformity with these objectives". On August 20, 1947 the committee made its report relative to Fgan in advance of the other portions of its report so as to provide authentic information and pertinent recommendations which might be followed with confidence by those concerned, stating that "Ship operators, port authorities, stevedores and others are awaiting the findings and recommendations of the federal government as a guide to safety". Nothing in the report suggests any danger from internal heating of Fgan or makes any recommendation with respect to internal ventilation of the mass by rice ventilators or otherwise. Not only was stowage in paper bags not condemned by the report, but it recommended their use under specifications to be promulgated by the Interstate Commerce Commission. There was a recommendation that paper be not used as dunnage; but this was for the purpose of "reducing the combustible material present in the hold" without any suggestion that its contact with the Fgan might lead to internal heating or spontaneous combustion. This committee was not only itself composed of distinguished experts[3] but it presumably sought the advice and assistance of the most competent experts on the subject then available. When it filed its report not only had it been studying the causes of the Texas City disaster but it must also

3. The committee was composed of the following persons:
Colonel C. H. Dietrick, USA, Office, Chief of Ordnance, War Department; Lieut. Colonel K. W. Gillespie, USA, Office, Chief of Transportation, succeeded on July 21 by Lieut. Colonel Morton E. Townes, USA, of Transportation Corps; Lieut. Colonel Myer Fried, USA WDGS, War Department; Colonel F. H. Miles, Jr., USA, President, Army-Navy Explosives Safety Board; Colonel D. C. Hall, USA, Army-Navy Explosives Safety Board; Mr. J. W. Connelly, Office of Chief of Naval Operations, Navy Department; Mr. F. F. Dick, Bureau of Ordnance, Navy Department; Dr. Arno C. Fieldner, Department of Interior; Dr. Bernard Lewis, Bureau of Mines, Department of Interior; Mr. George W. Jones, Chemist, Bureau of Mines, Department of Interior; Mr. W. G. Finn, Department of Agriculture; Dr. R. O. E. Davis, Bureau of Plant Industry, Soils and Agricultural Engineering, Department of Agriculture; Mr. John A. Dickinson, National Bureau of Standards, Department of Commerce; Mr. V. E. Haninger, Section of Explosives, Interstate Commerce Commission; Mr. F. H. Van Riper, Special Assistant, U. S. Maritime Commission; Mr. H. A. Campbell, Chief Inspector, Bureau of Explosives, Association of American Railroads; Mr. W. G. McKenna, Chief Chemist, Bureau of Explosives, Association of American Railroads; Mr. William T. Butler, Chief, Hazard Prevention Section, Merchant Vessel Inspection Division, U. S. Coast Guard, Treasury Department.

have known of the disaster to the Ocean Liberty which had occurred three weeks before. It would not be reasonable to hold the carrier or the stevedore chargeable with knowledge that this expert committee did not have, or with reaching conclusions that it did not reach after careful study, or with negligence in not adopting safety measures that the committee did not so much as suggest.

■ Even if the Terminal Shipping Company should be held guilty of negligence in failing to provide adequate ventilation in the stowage of the Fgan, we do not think that this could be held to be the fault of either Mowinckels or Cosmopolitan, its general agent who contracted with the stevedoring company, or that either can be held privy thereto under the Carriage of Goods by Sea Act, which provides, 46 U.S. C.A. § 1304(2) (b), that "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from (b) Fire, unless caused by the actual fault or privity of the carrier".

If there was negligence in failing to provide adequate ventilation for the Fgan, this was the negligence of the stevedore, the Terminal Shipping Company, and not the negligence of the carrier or its general agent who employed the stevedore. It is suggested that there was liability on the part of the carrier and its agent because in oral instructions and a letter to the stevedore the agent insisted that certain safety recommendations of the Board of Underwriters and the city fire department be followed and that the loading be done under the regulations and directions of the Coast Guard. That letter dated June 11, 1947, is as follows:

"There is booked for S.S. 'Ocean Liberty' due at Baltimore June 27–28th, a shipment of Ammonium Nitrate (fertilizer). This shipment of up to 4,000 tons is to be loaded at your port and we have tentatively laid out Nos. 1, 3 and 5 Holds, including Deep Tanks in No. 1, and Nos. 1 and 3 Tween Decks for this commodity. As the vessel will also load at New York, we would prefer to

have the compartments used for Nitrate completed at Baltimore.

"Prior to loading please see that the compartments are absolutely clean. Dunnage must be laid not only on tank tops and ceiling but also on bilge ceilings. During the loading operations have fire hose stretched and do not allow anyone to smoke in holds or on deck. The stevedore should instruct his men to handle hatch beams carefully to avoid sparks. In tween decks it will be necessary to leave sufficient headroom for air circulation. For other details and regulations you will consult the U. S. Coast Guard who must be notified and under whose direction this commodity is loaded."

■ There is manifestly nothing in this letter which shows that Mowinckels or Cosmopolitan retained any control over the loading. All that it does is stipulate that the stevedoring company observe certain precautions in loading which were prescribed by the public authorities, and that it load under the direction of the U. S. Coast Guard. Surely, such insistence upon safety regulations does not make the carrier privy to any fault or neglect of the stevedore; and without such privity there is no liability for the stevedore's negligence. Pertinent here is what was said by Mr. Justice Jackson, speaking for the Supreme Court in a case involving the fire statute, Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo (The Venice Maru) 320 U.S. 249, 250, 64 S.Ct. 15, 16, 88 L.Ed. 30. He said:

"Upwards of 660 tons of sardine meal in bags was stowed in a substantially solid mass in the hold. In view of its susceptibility to heating and combustion it had inadequate ventilation. As the ship neared the Panama Canal, fire broke out, resulting in damage to cargo and ship. The cause of the fire is found to be negligent stowage of the fish meal, which made the vessel unseaworthy. The negligence was that of a person employed to supervise loading to whom responsibility was properly dele-

gated and who was qualified by experience to perform the work. No negligence or design of the owner or charterer is found."

The court below, in an opinion by Judge Learned Hand, had exonerated the vessel under the Fire Statute, although approving a finding that there was negligence in the stowage. Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha, 2 Cir., 133 F. 2d 781. In that case the charterer's business was in charge of one Okubo who arranged with one Fegen to load the cargo of fish meal. Judge Hand, referring to the relationship which would charge the owner or charterer with responsibility for negligence in stowage, said, 133 F.2d 784:

"Only Okubo and Fegen can be even plausibly suggested as standing in the required relation to the charterer; and, although Okubo certainly did stand so, Fegen did not. Since the claimants argue otherwise we will consider the evidence in a little detail. In answer to interrogatories Okubo swore that 'in case of sardine meal' the charterer 'employed * * * Fegen to advise with the masters and chief officers on its loading and stowage in their respective vessels.' Again, that the master and chief officer of the 'Venice Maru' 'supervised' the stowage 'and, insofar as the loading and stowage of sardine meal was concerned, were advised by Mr. F. H. Fegen.' Upon letters rogotory he swore that the charterer 'employed * * * a surveyor * * * to inspect stowage on every vessel.' Fegen swore that he 'was appointed by Cornes & Co. at Kobe to lay out the manner and method of stowage of the sardine meal and to supervise such stowage * * * and I believe that Cornes & Co. were employed by Kawasaki Kisen Kabushiki Kaisha'; that he did so, 'and gave instructions to Chief Officer of the "Venice Maru" regarding manner and method of the stowage and arrangement of ventilation and also exercised supervision over said stowage and ventilation'. This was very far from making Fegen the local manager at Kobe. It was

Okubo who had that position, and whose personal dereliction was necessary to fix any liability upon the charterer for damage by fire."

See also Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403; American Tobacco Co. v. The Katingo Hadjipatera, 2 Cir., 194 F.2d 449; Hoskyn & Co. v. Silver Line, 2 Cir., 143 F. 2d 462; The Ida, 2 Cir., 75 F.2d 278.

We do not think that the carrier can be held liable on the theory that stowage of cargo was a non-delegable duty negligence in performance of which should be imputed to the carrier in determining whether it had exercised due care to make the vessel seaworthy. Directly in point is the case of Earle & Stoddart v. Ellerman's Wilson Line, supra, 287 U.S. 420, 53 S.Ct. 200, in which a vessel was held to be exempted from liability by reason of the fire statute, although she was rendered unseaworthy before leaving port as the result of the negligent stowage of coal in her bunkers by her chief engineer. The exemption of the fire statute is admittedly the same as that provided by the Carriage of Goods by Sea Act. The Supreme Court, speaking through Justice Brandeis, thus dealt with the questions which seem to be crucial here:

"The contention is that the statute does not confer immunity where the fire resulted from unseaworthiness existing at the commencement of the voyage and discoverable by the exercise of ordinary care; * * *. The first statute, in terms, relieves the owners from liability 'unless such fire is caused by the design or neglect of such owner.' The statute makes no other exception from the complete immunity granted. The cargo owners do not make the broad contention that the statute affords no protection to the vessel owner if the fire was caused by unseaworthiness existing at the commencement of the voyage. Their contention is that it does not relieve the owner if the unseaworthiness was discoverable by due diligence. The argument is that the duty of the owner to make the ship seaworthy before starting on her voyage is

nondelegable, and if the unseaworthiness could have been discovered by due diligence there was necessarily neglect of the vessel owner. * * * The courts have been careful not to thwart the purpose of the fire statute by interpreting as 'neglect' of the owners the breach of what in other connections is held to be a nondelegable duty."

The purpose of the fire exemption in the Carriage of Goods by Sea Act is the same as the purpose of the fire statute, and pertinent, therefore, is what was said by Mr. Justice Jackson in the Venice Maru, supra, as follows:

"At common law, the shipowner was liable as an insurer for fire damage to cargo. We may be sure that this legal policy of annexing an insurer's liability to the contract of carriage loaded the transportation rates of prudent carriers to compensate the risk. Long before Congress did so, England had separated the insurance liability from the carrier's duty. To enable our merchant marine to compete, Congress enacted this statute. It was a sharp departure from the concepts that had usually governed the common carrier relation, but it is not to be judged as if applied to land carriage, where shipments are relatively multitudinous and small and where it might well work injustice and hardship. The change on sea transport seems less drastic in economic effects than in terms of doctrine. It enabled the carrier to compete by offering a carriage rate that paid for carriage only, without loading it for fire liability. The shipper was free to carry his own fire risk, but if he did not care to do so it was well known that those who made a business of risk-taking would issue him a separate contract of fire insurance. Congress had simply severed the insurance features from the carriage features of sea transport and left the shipper to buy each separately. While it does not often come to the surface of the record in admiralty proceedings, we are not unaware that in commercial practice the shipper who buys carriage from the shipowner usually buys fire protection from an insurance company, thus obtaining in two contracts what once might have been embodied in one. The purpose of the statute to relieve carriage rates of the insurance burden would be largely defeated if we were to adopt an interpretation which would enable cargo claimants and their subrogees to shift to the ship the risk of which Congress relieved the owner. This would restore the insurance burden at least in large part to the cost of carriage and hamper the competitive opportunity it was purposed to foster by putting our law on an equal basis with that of England."

While there has been much confusion of many issues in a lengthy trial, the case on the issue of negligence in the stowage attributable to the carrier is comparatively simple and comes to this: Fgan was a new chemical product about whose qualities little was known by the shipping public. The disastrous explosion at Texas City aroused the interest of shippers and underwriters and the subject of danger in shipping this product was given immediate study. It was studied in Baltimore as well as elsewhere and representatives of the Terminal Shipping Company participated in the study. When the shipment of Fgan was offered to Cosmopolitan, it employed Terminal to do the loading and directed it to follow the instructions of the Coast Guard, the Fire Department and the Board of Underwriters. In so doing, Cosmopolitan exercised all the care that could be required of a reasonably prudent man in the premises; and, if there was negligence in the stowage, it was the fault of Terminal, whose negligence would not constitute actual fault or privity on the part of the carrier.

We find nothing to the contrary in the cases upon which the cargo owners rely. In Bank Line v. Porter, 4 Cir., 25 F.2d 843, the cargo was one involving well known danger of spontaneous combustion if kept in storage an undue length of time, and the carrier negligently failed to take proper precautions to avoid the danger when the

voyage was prolonged as a result of breakdown in the vessel's machinery. The question in that case was the seaworthiness of the vessel to carry a cargo likely to yield to spontaneous combustion, in view of a known defective condition of machinery that unduly prolonged the voyage. The decision of that question can manifestly have no relevance here. Equally irrelevant is the decision in Cornec v. Baltimore & O. R. Co. (The Richelieu), 4 Cir., 48 F. 2d 497, where recovery was allowed against a railroad company loading a vessel, not the vessel or its owners, because of negligence in the loading. This negligence consisted in operating sparking machinery in a cloud of explosive pitch dust. This case dealing with the negligence of the stevedore, throws no light on the liability of the carrier for the stevedore's negligence. In the Nichiyo Maru, 4 Cir., 89 F.2d 539, the question involved was whether deterioration of fish meal was due to its inherent nature or to negligent stowage. In holding that the deterioration was due to negligent stowage, the court based its decision on the ground that known qualities of fish meal and approved methods of stowing it had been ignored. There was no decision that the carrier was liable for negligent stowage by the stevedore. That question was decided directly to the contrary in the Venice Maru, supra.

The question of deviation was fully and correctly treated in the opinion of the court below and we are in thorough accord with what was there said with regard thereto. See also The San Giuseppe, 4 Cir., 122 F.2d 579.

[7, 8] Libelants contend here that Mowinckels is liable as an insurer for that part of the cargo stored on deck but covered by clean bills of lading. No such point seems to have been made in the court below or considered by the trial judge and it is too late to make it for the first time on appeal. 3 Am.Jur. p. 25; Minnich v. Gardner, 292 U.S. 48, 53, 54 S.Ct. 567, 78 L.Ed. 1116; Burnet v. Com. Imp. Co., 287 U.S. 415, 418, 53 S.Ct. 198, 77 L.Ed. 399. At all events, there is nothing in the point. Even though stowage on deck of cargo shipped under clean bills of lading constitutes a deviation, this does not deprive the carrier of his right to exoneration under the fire provision of the Carriage of Goods by Sea Act, just as it does not deprive the owner of the protection of the fire statute, unless it was a cause of the fire. See The Ida, 2 Cir., 75 F.2d 278, 279; Globe & Rutgers Fire Ins. Co. v. United States, 2 Cir., 105 F.2d 160, 166; The Venice Maru, D.C., 39 F.Supp. 349, 353; The Margaret Lykes, D.C., 57 F.Supp. 466, 470. As said by this court in The San Giuseppe, 4 Cir., 122 F.2d 579, 586, "While it is true that, upon a deviation, the vessel becomes an insurer of the cargo, the doctrine seems fairly well established that she is not liable for loss or damage which 'must equally have occurred even if there had been no deviation'. Scrutton on Charter Parties and Bills of Lading, p. 310; Story on Bailments 8th Ed., pp. 466, 467; Williston on Contracts § 1096; James Morrison & Co., Ltd. v. Shaw, Savill & Albion, Ltd. (1916) 2 K.B. 783; The Hermosa, 9 Cir., 57 F.2d 20, 27; Maghee v. Camden, etc., R. Co., 45 N.Y. 514, 6 Am.Rep. 124; Memphis & C. R. R. Co. v. Reeves, 10 Wall. 176, 19 L.Ed. 909; The Ida, 2 Cir., 75 F.2d 278; Globe & Rutgers Fire Ins. Co. v. United States, 2 Cir., 105 F.2d 160, 166; The Caterina Gerolimich, D.C., 43 F. 2d 248, 252." See also The Delaware, 14 Wall. 579, 598, 20 L.Ed. 779.

For the reasons stated, the decree appealed from will be reversed in so far as it grants recovery against Mowinckels and will be affirmed in so far as it exonerates Cosmopolitan from liability, and the case will be remanded with direction to dismiss the libels. The costs on the appeals taken will be taxed against libelants, except that no cost will be taxed for printing the appendix to the brief of appellants because of failure to comply with the provisions of rule 10 of this court.

■ In American Surety Co. of New York v. First National Bank, 4 Cir., 141 F. 2d 411, 418, we notified counsel in the following language that we expected the provisions of rule 10 to be observed. We said:

"We expect counsel to observe the provisions of our Rule 10, to the effect

that the record shall not be printed, but that the parties shall state the facts in their briefs, printing as an appendix thereto those parts of the record material to the questions presented that they desire the Court to read. * *

"Since the abolition of the rule requiring narration of the record, something must be done to reduce the cost of printing and to obviate the necessity of the Court's having to read great masses of immaterial matter. We have attempted to solve the problem by the adoption of Rule 10. Under that rule we expect counsel to select from the typewritten record and print in the appendix to their briefs only those material parts of the record which it is considered important for us to read because they throw light on controverted questions presented by the appeal, such parts, for example, as a diligent lawyer would ordinarily quote in a brief before a trial judge reviewing the report of a master. Counsel should not forget that the entire record is before us in typewritten form and that reference can be made to it without printing in the appendix the parts to which reference is made. We will not countenance evasion of the rule by printing the entire record as an appendix to the brief; nor will we countenance wholesale printing of irrelevant matter, even if there is colorable compliance with the rule. Violation of the rule will be given consideration, as here, in taxation of costs; and, in aggravated cases of violation, briefs and appendices will be stricken or a reprinting of the appendix in accordance with the rule will be ordered."

We expect the rule to be observed in admiralty and patent cases as well as in other appeals and by counsel from other circuits as well as by resident counsel.

Affirmed in part, reversed in part and remanded.

SOPER, Circuit Judge (dissenting).

On April 16 and 17, 1947, an appalling disaster occurred at the City of Texas City, Texas, on Galveston Bay, when some 600 persons were killed and many millions of property were destroyed by the explosions of the S/S Grand Camp and S/S High Flyer in the harbor. Although there was some uncertainty at the time as to the cause of the explosion the probability was very strong and it was later judicially determined that it was due to the spontaneous combustion of a quantity of ammonium nitrate, fertilizer grade, which formed part of the vessels' cargoes. The attention of the whole country was aroused by the disaster and the shipping industry was led to investigate the circumstance in order to avoid similar occurrences in the future. Agencies of the United States were also stirred to investigation since huge claims were presented against the government under the Federal Tort Claims Act, 28 U.S. C.A. §§ 1346, 2671–2680, on the theory that government employees had participated in the manufacture and distribution of the fertilizer which was known to be possessed of explosive properties without exercising due care for the safety of the public.

It has recently been held by a divided court in the Fifth Circuit In re Texas City Disaster Litigation, 197 F.2d 771, that the United States had no liability for the disaster under the Federal Tort Claims Act, as a manufacturer or distributor of a dangerous explosive, because the government's activities were within the statutory exclusion with respect to the performance of discretionary functions on the part of federal agencies or employees; but in a concurring opinion, 197 F.2d 781, the exoneration of the government was based on the finding that the explosions were caused by the too close confinement of the fertilizer on the ships with which the United States had nothing to do.

Two months later, on June 28, 1947, the S/S Ocean Liberty arrived at the port of Baltimore and between that date and July 5 was loaded in part with 3309 tons of the same kind of material. As described in the opinion of the court, it was stowed in the holds enveloped in heavy paper, so that all circulation of air within the mass was precluded, and a condition favorable

to spontaneous combustion was created. The holds containing the Fgan were then closed and the ship sailed to New York City where additional cargo was taken on, and thence to Brest, France, where she arrived on July 23, and a part of her cargo was discharged during the first five days. During the period between July 5 and July 28, when high summer temperatures prevailed, the fertilizer remained without interior circulation of air in the tightly closed cargo spaces, and since it is a poor conductor of heat and is subject to heating under these conditions, a dangerous situation was created. The result was, as has been found by the District Judge and by this court on appeal, that on July 28 an explosion took place on the ship caused by the spontaneous combustion of the nitrate and thereby the ship and the cargo were destroyed and some lives were lost.

Obviously the duty to use due care to inquire into the nature and qualities of Fgan rested heavily upon the owners and agents of the ship who undertook to stow the dangerous material on board while the memory of the Texas calamity was still fresh in the national consciousness. Even under ordinary circumstances, as we have held, a shipowner must use due care to ascertain the characteristics of goods offered for shipment. See Bank Line v. Porter, 4 Cir., 25 F.2d 843, 845; The Nichiyo Maru, D.C.Md., 14 F.Supp. 727, affirmed 4 Cir., 89 F.2d 539, 543; The Richelieu, 4 Cir., 48 F.2d 497; The Ferncliff, D.C. Md., 22 F.Supp. 728, affirmed Smith v. The Ferncliff, 4 Cir., 105 F.2d 1021. But in the present instance, due care rose to the highest degree of diligence to be sure that every reasonable precaution be taken so as to avoid the loss of human life and property, for it had been tragically demonstrated that great danger lurked in the carriage of the substance and that ordinary methods of stowage were not enough. Nothing else would satisfy an ordinarily prudent man.

Judge Chesnut reached the conclusion, correctly I think, that the owners and agents of the ship did not make that careful investigation which the dangerous and uncertain qualities of the material required, and hence the libellants were entitled to recover. He showed that the carrier, knowing that it was dealing with a dangerous material, was careful to follow the instructions of the Coast Guard, the Baltimore Fire Department and the New York Board of Underwriters, but that these lay authorities did not know that Fgan was susceptible to spontaneous combustion, and directed the cargo to be so stowed as to actually increase the danger from this source.

In this respect he said (Accinanto, Ltd. v. Cosmopolitan Shipping Co., D.C.Md., 99 F.Supp. 261, 278, Finding 26): "It is clear enough on the evidence that the carrier in accepting Fgan knew that it was dealing with a very dangerous chemical. For this reason unusual care was taken in the method of stowage in certain respects. What was evidently known to the carrier was that a great danger would arise from any fire. And in this respect I find from the evidence that the recommended precautions to avoid fire in stowage were carefully complied with. Thus contact between the paper bags and the metal portions of the hold were avoided by wooden dunnage and paper dunnage thereover. And finally there was over the whole mass of the stow placed a waterproof covering. The tween deck hatches were also closed and after the loading of general cargo in New York the deck hatches in number 3 tween deck were closed. But on the other hand the bags were placed tier upon tier to the number of 20 or more and they were stowed solidly without wooden or other dunnage forming any separation either horizontally or vertically between them to give extraordinary ventilation. In effect, therefore, the stowage of the fertilizer was adequate to and did successfully prevent fire originating in the loading outside of the stow. But unfortunately the extra care and precaution in avoiding the possibility of fire from outside the fertilizer resulted in exactly those conditions which greatly increased the danger of fire from within, that is, spontaneous combustion. I find as a fact that neither the carrier nor its general agents nor its subagents, nor for that matter neither the representatives of the Coast Guard, the Fire Department or the New York Board of Underwriters, knew that Fgan

was, as so stowed, subject to spontaneous combustion. In stowing it or permitting it to be stowed as they did, what they had in mind was protection against fire originating from outside. They entirely overlooked the necessity of guarding against fire from within the fertilizer itself by spontaneous combustion. The dominant issue of fact thus becomes whether the carrier or its agents could by diligent inquiry have learned of the danger of spontaneous combustion, and if so, should they have made such inquiry. I find on all the evidence that if the carrier exercised due diligence to make inquiry as to the nature and properties of Fgan it could have learned that it was susceptible to spontaneous combustion when stowed in large quantities in a very confined space without free circulation of air. In this case neither the carrier nor its general agents made any particular inquiry with regard to this feature of ship carriage of Fgan, despite the very great danger involved in the carriage of the fertilizer as so recently brought to their knowledge and attention by the Texas City disaster."

What was the inquiry that the carrier failed to make and what would it have disclosed? On July 1, 1947 there was extant a considerable body of scientific literature in relation to the properties of Fgan which are referred to in the opinions that have been filed in this case. The interpretation placed on this literature [1] by Judge Chesnut with which I agree is set forth in his Finding 23, 99 F.Supp. 277, as follows: "I find from the evidence that the scientific data prior to July 1947 contained in various reports, treatises and text books discloses that Fgan presented a serious danger of spontaneous ignition under certain conditions. While these conditions were not precisely and definitely determined, very important considerations related to contacts with certain foreign substances especially if of carbonaceous matter, the tem-

perature of initial storage, quantity or mass when stored, and when confined without adequate ventilation. That is to say, the danger of spontaneous combustion was increased if organic matter was mixed with Fgan, with increased temperature when stowed in large masses and that the greater the mass and the length of confinement would increase the danger; while lessening the mass with adequate ventilation would decrease the danger of spontaneous combustion."

In reaching this conclusion Judge Chesnut was guided by the testimony of Dr. George Bogdan Kistiakowsky, Professor of Chemistry and until recently Chairman of the Chemistry Department of Harvard University, and by the testimony of Dr. Chester S. Snell, consulting chemist and engineer of New York City. Speaking of the testimony of these scientists in Finding 20, 99 F.Supp. 275–276, the judge said:

"Dr. Kistiakowsky, a Harvard Professor of Chemistry who has specialized in the effects of heating of various chemicals (who also testified in the torts claims suits against the United States growing out of the Texas City disaster) testified as a witness for the libellants in this case. According to laboratory experiments made by him in 1948 he concluded that a 1% admixture of waxy coating for the granules of ammonium nitrate had the effect of increasing the tendency of ammonium nitrate fertilizer to spontaneous combustion and he adopted what he referred to as the 'critical mass' theory of spontaneous combustion which is to the effect that large masses of it in close confinement, as in a ship's hold, without unusually good ventilation tend to overheating and spontaneous combustion. Dr. Kistiakowsky also said that if the percentage amount of paraffin coating was increased from 1% to 5% it would greatly minimize the tendency

---

1. The findings of the District Court contain references to the scientific literature and reports of government agencies mentioned in the foregoing opinion of this court—see Finding 20, 99 F.Supp. 275; Finding 23, 99 F.Supp. 276; Finding 21,

99 F.Supp. 276, refers to the Inter-Agency report of the United States of August 20, 1947, which was prepared in contemplation of the Texas City suit against the government.

to self-heating. He instances the case of Nitrammon made by the DuPont Company which is 95% ammonium nitrate with 5% wax and is fairly safe and that by reason of its safety factor Nitrammon's transportation rate was much lowered. He and also Dr. Snell, another analytical chemist, testifying for the libellants, expressed the view that the scientific literature about ammonium nitrate prior to July 1, 1947 was to the effect that ammonium nitrate fertilizer was susceptible to spontaneous heating and combustion under certain conditions, among which were contact with certain metals, such as zinc, or when confined in too large areas without adequate ventilation. They referred particularly to the U. S. Ordnance Safety Manual issued in 1945 and the U. S. Department of Agriculture Circular, 719, headed 'Explosibility and Fire Hazard of Ammonium Nitrate Fertilizer' issued in March 1945. Attention was called to what was said on page 22 on the subject of safety measures, that 'Bearing in mind that ammonium nitrate is an explosive and supports combustion, it should be handled in such a way as to avoid conditions that may make it dangerous. More than ordinary caution should be practised along the lines indicated * * *.'

"Respondents called no expert scientific witnesses on their behalf."

In considering the availability of scientific guidance to the business world in repect to the nature of Fgan, it is a significant fact that less than a week after the Texas City explosion Dr. Kistiakowsky made an examination at Texas City of the recent disaster at the request of Montsanto Chemical Company. He also reviewed the literature on the subject and within two or three weeks thereafter, on the basis of the information so acquired, made a report to the effect that the fire on the Grand Camp was probably due to spontaneous ignition. His conclusion was based on his investigations and on repeated descriptions in the literature that ammonium nitrate reacts very rapidly with paper and other cellulose materials. In this connection he took into consideration articles published and investigations made by the Department of Agriculture showing the reaction between paper or paper-like materials and ammonium nitrate, together with the theoretical knowledge gained from scientific publications. Dr. Snell's testimony as to the conclusions to be drawn from the facts known to the scientific world on July 1, 1947 was to the same effect.

It is of the utmost importance to bear in mind that the scientific testimony on which the District Court relied is without contradiction in the record before his court. Although the scientific literature and reports of government agencies deal with a comparatively new article of commerce and to a great extent are technical in nature, no scientist was called by the carrier to contradict or qualify what Dr. Kistiakowsky and Dr. Snell had said. If their conclusions, based on their investigations and the literature available on July 1, 1947 were not justified, it would have been an easy and normal step in a case of this importance for the carrier to have produced experts to point out their mistakes; and the only reasonable conclusion to be borne from their failure to do so is that no scientific man could be found who would serve the purpose.

It is not possible to relieve the carrier in this case under the fire section of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2)(b), which exempts the carrier and the ship from responsibility for loss resulting from fire "unless caused by the actual fault or privity of the carrier". The uncontradicted evidence shows that Cosmopolitan Shipping Company, Inc. was the general agent of Mowinckels in the United States, and that Cosmopolitan gave explicit instructions to the stevedore in Baltimore as to how the fertilizer should be stowed on the ship. See the letter of June 11, 1947 from Cosmopolitan to the Terminal Shipping Company set out in the foregoing opinion of the Court.

The managing agents of Mowinckels in Europe had knowledge that Fgan was to

be transported on the ship because Cosmopolitan took the unusual precaution to consult them and secure their consent before accepting the shipment; and the letter of instructions was then written, since Cosmopolitan being aware of the danger, was unwilling to entrust the stowage unreservedly to the stevedore. Hence Mowinckels is not exonerated by the statute since the neglect of the managing officer or agent of the carrier is attributable to the carrier itself under the statute. Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30; The Pinellas, 4 Cir., 45 F.2d 174, 177.

The letter to which we have referred serves only to establish actual privity on Cosmopolitan's part. It not only gave explicit instructions to the stevedore, with reference to the cleaning of the compartments, the use of dunnage, the employment of a fire hose and the prohibition of smoking through the loading operations, but it specifically instructed the stevedore to load the vessel under the direction of the United States Coast Guard. In short, the stevedore was not given a free hand in stowing the cargo but was ordered to follow the directions of the agency whose failure to ascertain the nature and the quality of the fertilizer led to the destruction of the ship. There could hardly be a clearer illustration of privity on the part of the carrier. See Williams S. S. Co., Inc., v. Wilbur, 9 Cir., 9 F.2d 622; The Denali, 9 Cir., 105 F.2d 413, 112 F.2d 952; The E. Madison Hall, 4 Cir., 140 F.2d 589; American Tobacco Co. v. The Katingo Hadjipatera, D.C.N.Y., 81 F.Supp. 438.

The decision in Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo, supra, offers no refuge to the carrier, because in that case "The negligence was that of a person employed to supervise loading to whom responsibility was properly delegated and who was qualified by experience to perform the work. No negligence or design of the owner or charterer is found." See 320 U.S. 250, 64 S.Ct. 16. The decision of the Supreme Court was confined to the question whether the Fire Statute extinguishes claims against the vessel as well as claims against the owner. The facts of the case are more fully set out in the opinion of Judge Learned Hand in the Court of Appeals, 133 F.2d 781, 784–785. He showed that the stowage of the ship was in charge of one Fegen, who was employed for the work, but was not the agent of the ship authorized to represent the owner. That relationship was held by one Okubo, who employed Fegen but "paid no further attention to the stowage." Judge Hand said that unless Okubo was personally guilty of some negligence the owner was exonerated; but no evidence of neglect on Okubo's part was found